WISCONSIN'S ENVIRONMENTAL DECADE, INC., Respondent, v. PUBLIC SERVICE COMMISSION, and another, Appellants.

*No. 75–403. Argued March 29, 1977.—Decided July 1, 1977.*
(Also reported in 256 N. W. 2d 149.)

For the appellant Public Service Commission there were briefs by *Bronson C. La Follette,* attorney general, *Steven M. Schur,* chief counsel, and *Steven Levine,* assistant chief counsel of Public Service Commission, and oral argument by *Mr. Schur.*

For the appellant Wisconsin Electric Power Company there were briefs by *Robert H. Gorske,* general counsel, Wisconsin Electric Power Company, *W. Stuart Parsons, T. Michael Bolger* and *Quarles & Brady,* and oral argument by *Mr. Parsons,* all of Milwaukee.

For the respondent there were briefs by *Melvin L. Goldberg* and oral argument by *Kathleen M. Falk,* both of Madison.

ABRAHAMSON, J.   On December 4, 1972, Wisconsin Electric Power Company (hereinafter WEPCO) filed an application with the Public Service Commission of Wisconsin for authority to increase its electric rates so as to be "made whole" for increases in taxes, depreciation, the cost of money and other operating costs occurring subsequent to a December 3, 1971, rate order of the Commission. The application requested rate increases such as would permit a return on common stock equity of not less than the 12 percent authorized by the Commission in its December 3, 1971 order. Hearings were held January 16 and 17, 1973, at Madison and the record was closed at the conclusion of the January 17th hearing. Wisconsin's Environmental Decade (hereinafter referred to as Decade) participated in these proceedings, contending, among other things, that the Commission was required by the Wisconsin Environmental Policy Act (WEPA), ch. 274, Laws of 1971, to prepare an environmental impact statement before making its decision on the rate increase.

On March 16, 1973, the Commission issued its order authorizing rate increases averaging approximately 5.2 percent which were designed to provide for an increase in revenue of $12,722,500. The Commission did not address Decade's WEPA contentions in its March 16th order. On April 5, 1973, Decade filed an application for rehearing before the Commission, asserting again that the Commission's order of March 16, 1973 was a major action significantly affecting the quality of the human environment which required the preparation of an Environmental Impact Statement (EIS). Rehearing was granted by order of April 25, 1973, "for the sole, exclusive and limited purpose of receiving briefs and hearing oral argument" on this issue. On August 1, 1973, the Commission issued an order affirming its order of March 16th and holding that no EIS was required, stating in part:

"The . . . rate Order of March 16, 1973, in this proceeding does not have a direct effect upon the environment. Rather the direct effect of the Order is economic, not environmental. Whatever connection such Order has with the environment is remote and indirect. Moreover, nothing has been submitted to the Commission which would cause it to conclude that any environmental impact statement prepared for purposes of this proceeding could be based on anything other than pure speculation. In these circumstances, the Commission is of the opinion that an environmental impact statement is not required."

Chairman William F. Eich and Commissioner Richard D. Cudahy each filed lengthy concurring opinions explaining their reasons for concluding that the impact statement was not required.

On August 28, 1973, Decade petitioned the circuit court for Dane county for review of the Commission's orders pursuant to sections 227.15 and 227.16, Stats. Numerous issues were raised in the petition for review. However, only the Commission's ruling that no environ-

mental impact statement need be prepared was addressed by the circuit court. In a memorandum decision filed June 16, 1975, the trial court concluded that the Commission's order did not demonstrate sufficient consideration of environmental factors to validate its negative EIS determination. The court was of the view that some actual attempt to investigate the environmental consequences of rate orders was required before the Commission's determination that no EIS was warranted could stand. In view of the Commission's apparent failure even to study and analyze, in its no-impact statement the various authorities dealing with price/demand relationships for electricity which were cited to the Commission by the parties, the court was unimpressed by the Commission's protestations that an EIS would be a futile exercise. Accordingly, by judgment entered August 25, 1975, the court remanded the matter to the Commission for further investigation and an evidentiary hearing as to whether an environmental impact statement was required. From this judgment both the Commission and WEPCO have appealed.

Two issues are presented:

A. What is the standard for judicial review of the Commission's decision not to prepare an EIS; and

B. Under that standard, was the trial court correct in holding the Commission's decision inadequate?

I.

The Wisconsin Environmental Policy Act is substantially patterned after the National Environmental Policy Act of 1969 (NEPA), 42 USC sec. 4321, et seq. Like its federal counterpart, WEPA contains a broad statement of governmental commitment to the protection and enhancement of the environment (ch. 274, Laws of 1971,

sec. 1)¹ and imposes upon governmental agencies certain procedural obligations with respect to their decision-

¹ Sec. 1 of ch. 274, Laws of 1971, which was not made a part of the Wisconsin Statutes, provides:

"SECTION 1. LEGISLATIVE PURPOSE. (1) The purposes of this act are to declare a policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the important ecological systems and natural resources.

"(2) The legislature, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of this state, in cooperation with other governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations.

"(3) In order to carry out the policy set forth in this act, it is the continuing responsibility of this state to use all practicable means, consistent with other essential considerations of state policy, to improve and coordinate plans, functions, programs, and resources to the end that the state may:

"(a) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(b) Assure safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

"(c) Attain the widest range of beneficial uses of the environment while attempting to minimize degradation, risk to health or safety, or other undesirable and unintended consequences;

"(f) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

"(4) The legislature recognizes that each person should enjoy a healthful environment and that each person has a responsibility

making processes to assure that the substantive policies of the Act will be implemented (ch. 274, Laws of 1971, sec. 2, creating sec. 1.11, Stats.).

The evident purpose of WEPA was to effect an across-the-board adjustment of priorities in the decision-making processes of agencies of state government. The Act constitutes a clear legislative declaration that protection of the environment is among the "essential considerations of state policy," and as such, is an essential part of the mandate of every state agency. However, the scheme of the Act is not directly to control agency discretion, but to require that agencies consider and evaluate the environmental consequences of alternatives available to them in the exercise of that discretion, and to require that they undertake that consideration in the framework sec. 1.11 provides.

Of specific concern here is the environmental impact statement provision of sec. 1.11(2)(c), Stats. That section requires that "to the fullest extent possible," all agencies of the state shall prepare a detailed environmental impact statement (EIS) on "proposals for legislation and other major actions significantly affecting the quality of the human environment . . . ." The impact statement is to substantially follow the guidelines issued by the United States Council on Environmental Quality under NEPA,[2] and must include considerations of:

to contribute to the preservation and enchancement of the environment."

[2] Title II of NEPA, 42 USCA sec. 4341, et seq., created the Council on Environmental Quality with broad responsibility to review and appraise the various programs and activities of the federal government in light of NEPA's policies and goals, and to report to the president thereon. By Executive Order 11514, March 5, 1970, 3 CFR 271, 35 Fed. Reg. 4247 (1970), the President directed the council to, among other things, issue guidelines to federal agencies for the preparation of environmental impact statements. The council thereafter published three sets of NEPA

"1. The environmental impact of the proposed action;

"2. Any adverse environmental effects which cannot be avoided should the proposal be implemented;

"3. Alternatives to the proposed action;

"4. The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

"5. Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"6. Such statement shall also contain details of the beneficial aspects of the proposed project, both short term and long term, and the economic advantages of the proposal."[3]

Before making the environmental impact statement the agency is required by sec. 1.11(2)(d), Stats., to obtain the comments of any other agency which has jurisdiction or special expertise with respect to any environmental impact involved. The impact statement together with the comments of the appropriate agencies must be made available to the governor, the Department of Natural Resources and the public, and a public hearing must be

guidelines: *CEQ Interim Guidelines*, May 11, 1970, 35 Fed. Reg. 7390 (1970); *CEQ Guidelines*, April 23, 1971, 36 Fed. Reg. 7724 (1971), superseding the interim guidelines; and *CEQ Guidelines*, August 1, 1973, 40 CFR sec. 1500.1, et seq., which superseded the April 23, 1971 guidelines.

WEPA did not establish any parallel to the Council on Environmental Quality created by NEPA. However, the Governor of Wisconsin has, by executive order, promulgated two sets of guidelines, based upon proposals of the Interagency WEPA Coordinating Committee, and has directed compliance therewith by all state agencies listed in ch. 15, Stats., including attached boards and commissions. *Guidelines for the Implementation of the Wisconsin Environmental Policy Act*, issued by Executive Order No. 69, of December 5, 1973; *Revised Guidelines for the Implementation of the Wisconsin Environmental Policy Act*, issued by Executive Order No. 26, of February 12, 1976.

[3] Sec. 1.11(2)(c), Stats.

held before a final decision on the proposed action is made.[4]

## II.

The Commission contends that the circuit court erred by placing upon the Commission the burden of demonstrating that the rate proceeding herein was not a major action significantly effecting the quality of the human environment. We think this contention somewhat mischaracterizes the circuit court's approach. A reading of the circuit court's well-reasoned decision indicates that the burden it placed upon the Commission was not that of proving the absence of a significant environmental effect, but of producing a reviewable record which demonstrated that its decision was reached upon a sufficient preliminary factual inquiry premised upon a proper construction of the obligations WEPA imposes. As explained below, we believe the circuit court was correct in placing this burden upon the Commission and in determining that it was not met here.

It is important to note that the threshold decision whether an EIS should be prepared is not of the usual

---

[4] Sec. 1.11(2) (d), Stats., provides in part:

". . . Prior to making any detailed statement, the responsible official shall consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate agencies, which are authorized to develop and enforce environmental standards shall be made available to the governor, the department of natural resources and to the public. Every proposal other than for legislation shall receive a public hearing before a final decision is made. Holding a public hearing as required by another statute fulfills this section . . . ."

For a survey of state agency compliance with WEPA, see Special Student Project, Jean Hanson, *Agency Decision Making Under the Wisconsin Environmental Policy Act*, 1977 Wis. L. Rev. 111.

variety of administrative determination. The agency is not here adjudicating the rights of parties before it, nor is it exercising a delegated legislative power. WEPA imposes upon agencies of the state duties which the legislature has determined to be necessary for the public welfare. When a negative EIS determination is challenged, the question is whether the agency itself has complied with the letter and spirit of WEPA. What was said in a leading federal case regarding the United States Atomic Energy Commission's responsibilities under NEPA is equally appropriate here:

". . . NEPA establishes environmental protection as an integral part of the Atomic Energy Commission's basic mandate. The primary responsibility for fulfilling that mandate lies with the Commission. Its responsibility is not simply to sit back, like an umpire, and resolve adversary contentions at the hearing stage. Rather, it must itself take the initiative of considering environmental values . . . ."[5]

Moreover, the threshold decision whether to prepare an EIS occupies a critical position within the context of WEPA's operation. A negative determination at the initial stage may eliminate to a significant degree environmental consideration by the agency and may curtail much of the input, which an EIS is designed to foster, of other governmental agencies and the public in the agency's decision process. It is obvious that achievement of WEPA's goals will be significantly compromised if ill-advised determinations not to prepare an EIS are permitted by the courts to stand. Thus a consideration of the manner in which WEPA was intended to function dictates a liberal approach to the threshold decision of whether the impact statement should be prepared.

Nevertheless, within an agency there are countervailing forces to an agency's adopting this liberal approach.

[5] *Calvert Cliffs Coordinating Committee v. AEC*, 449 F.2d 1109, 1119( D.C. Cir. 1971).

The preparation of a statement may require considerable time and effort and may entail consideration of factors with which the agency has not previously dealt and which are foreign to its perceived primary function. The agency's primary function is generally not environmentally oriented. The agency may in complete good faith believe it is already giving full consideration to environmental factors, that compliance with WEPA would therefore be superfluous, and that additional consideration of environmental factors would unduly impede the primary function of the agency. For these and related reasons, it is apparent that an agency called upon to make the threshold decision about the need for an EIS under WEPA may very well approach the question with a bias favoring a negative conclusion.[6]

These circumstances distinguish the threshold WEPA determination from the usual administrative determinations, and they must be considered by reviewing courts. The circuit court was correct in subjecting the Commission's decision to a searching inquiry. The circuit court was entitled to demand that a reviewable record be produced to support the agency decision and to ask with respect to that record:

"First, did the agency take a 'hard look' at the problem, as opposed to bald conclusions, unaided by preliminary investigation? . . . Second, did the agency identify the relevant area of environmental concern? . . . Third, as to problems studied and identified, does the agency make a convincing case that the impact is insignificant?"[7]

As one federal court observed with respect to NEPA:

---

[6] See Peltz & Weinman, *NEPA Threshold Determinations: A Framework of Analysis*, 31 U. of Miami L. Rev. 71, 87–88 (1976).

[7] *Maryland Nat. Capital Park & Planning Comm. v. Postal Service*, 487 F.2d 1029, 1040 (D.C. Cir. 1973); *see also Nader v. Butterfield*, 373 F. Supp. 1175, 1180 (D.D.C. 1974).

"The spirit of the Act would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review."[8]

The appropriate standard of review of decisions by federal agencies not to file impact statements under NEPA is a problem that has received much attention from commentators and in the courts.[9] Though review has generally been exacting, the federal courts have not been in agreement on the formulation of the standard to be employed. Some cases have undertaken to review the decision *de novo*,[10] while others have adopted the arbitrary and capricious standard of review.[11] The standard which appears to have been most widely accepted, however, is whether the decision not to prepare an EIS was reasonable under the circumstances. In *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1248, 1249 (10th Cir. 1973), the Court of Appeals for the Tenth Circuit held that the district court had erred in applying the "arbitrary and capricious" standard of review, and explained the reasonableness standard as follows:

[8] *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 (5th Cir. 1973).

[9] *See* for example, Deutsch, *The National Environmental Policy Act's First Five Years*, 8 Env. Affairs 3, 19–38 (1975); Comment, *Judicial Review of a NEPA Negative Statement*, 53 Boston Univ. L. Rev. 879 (1973); Peltz & Weinman, *NEPA Threshold Determinations: A Framework of Analysis*, 31 Univ. of Miami L. Rev. 71 (1976); Baum, et al., *Negative NEPA: The Decision Not to File*, 6 Env. Law 309 (1975); Note, *Threshold Determinations Under Section 102(2)(c) of NEPA: The Case for "Reasonableness" as a Standard for Judicial Review*, 16 Wm. & Mary L. Rev. 107 (1974); Leventhal, *Environmental Decision Making and the Role of the Courts*, 122 U. Pa. L. Rev. 509 (1974). Cases interpreting NEPA are collected in an annotation at 17 A.L.R. Fed. 33 (1973).

[10] *Kisner v. Butz*, 350 F. Supp. 310 (N.D. W. Va. 1972).

[11] *Hanley v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied* 412 U.S. 908 (1973).

"We are persuaded . . . that the administrative decision was not one of discretion such as administrative agencies have in innumerable matters and which is referred to in the general terms of sec. 706(2)(A) of the Administrative Procedure Act, 5 U.S.C.A. sec. 706(2)(A) [setting forth the 'arbitrary and capricious' standard]. NEPA's specific requirements in sec. 102 clearly speak in mandatory terms, and do not leave the determination to administrative discretion. . . . This Court recently stressed that '[t]he sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action,' . . . .

"Of course, there must be a determination whether the statute applies and some area of judgment is involved. However, we are convinced that the compass of the judgment to be made is narrow and that the determination must be reasonable in the light of the mandatory requirements and high standards set by the statute. . . .

"We are persuaded that the general reference to discretion in sec. 706(2)(A) of the Administrative Procedure Act, although applicable to some other reviewable administrative decisions, see Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed.2d 136, does not apply here to the agency's determination under NEPA. Under the specific terms of NEPA we feel that the proper standard, as stated earlier, is whether the negative determination was reasonable in the light of the mandatory requirements and high standards set by the statute so as to be 'in accordance with law'—another ground of review in sec. 706(2)(A) which may be applied consistently with the procedural demands of NEPA." (Footnotes and citations omitted.)

*See also Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465, 466 (5th Cir. 1973) ; *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1319, 1320 (8th Cir. 1974) ; *City of Santa Clara v. Kleppe*, 418 F. Supp. 1243, 1246 (N.D. Cal. 1976).[12]

---

[12] The federal courts have in some cases gone beyond materials developed by the responsible agency to take additional evidence. *Save Our Ten Acres v. Kreger, supra* note 8; *Kisner v. Butz*,

■

We are of the opinion that the test of reasonableness should be applied to review a negative threshold decision under WEPA. Complete *de novo* review would be akin to treating the entire question of significant environmental effect as one of law. Where a question of law is presented, the reviewing court of course will determine the question independently regardless of the standard by which the agency's overall decision is to be tested. *See Pabst v. Dep't of Taxation*, 19 Wis.2d 313, 322–324, 120 N.W.2d 77 (1963). However, the question whether there is present in a given case a major action significantly affecting the environment will in general be a matter of both law and fact. Moreover, there may be cases under WEPA when some degree of deference to agency expertise is appropriate—provided the agency is shown to possess such expertise and to have applied it in good faith.

■

The arbitrary and capricious standard of review, on the other hand, gives too much room for the exercise of discretion by the agency. The obligation imposed by sec. 1.11(2)(c), Stats., like that of sec. 102 of NEPA, is not inherently discretionary.[13] It contemplates the'

---

*supra* note 10. Of course, in a ch. 227 review proceeding the court's review is confined to the administrative record except that testimony on alleged procedural irregularities may be taken in court. Sec. 227.20, Stats.

[13] "Of course, all of these Section 102 duties are qualified by the phrase 'to the fullest extent possible.' We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts." *Calvert*

exercise of judgment by the agency, but that judgment must be reasonably exercised within the limits imposed by the Act.

No general statement of a standard of review can provide a precise guideline of universal applicability. It is obvious that the inquiry needed to support an agency decision not to file an EIS will vary greatly with the circumstances. We do not doubt the correctness of the trial court's observation that there may be cases where it will be obvious to agency and court alike on the basis of facts that no EIS need be prepared. Moreover, we further agree with the trial court that facts constituting a bona fide challenge must be alleged by the petitioners for review. *See Save Our Ten Acres v. Kreger, supra.* The agency may not shift to petitioners such as Decade the duty of environmental inquiry placed upon the agency by statute,[14] but neither should allegations of environmental effect which are patently trivial or frivolous subject the agency decision to searching judicial review. However, where issues of arguably significant environmental import are raised—as we think are raised here—the agency must show justification for its negative-EIS decision.

We therefore conclude that the questions by which the agency decision was to be tested in the case at bar

*Cliffs Coord. Comm. v. AEC,* 449 F.2d 1109, 1114 (D.C. Cir. 1971).

[14] To say that an agency may not shift to others its own obligations under WEPA is not to say, however, that it may ignore such investigations as others may undertake voluntarily. One of the values WEPA seeks to advance is public awareness of and participation in decisions affecting the environment. Where an interested party does undertake to furnish information to an agency with respect to possible environmental effects of a proposed action, or to raise meritorious questions in respect thereto, it would be inconsistent with the intent of the Act for the agency not to give reasonable consideration to the matters presented to it.

were these: First, has the agency developed a reviewable record[15] reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed; second, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the results of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?

### III.

Fundamentally, Wisconsin Environmental Decade's position at all stages of this case has rested on the assertion that the Commission's actions in controlling the rates to be charged for electricity exert an effect on the demand for electricity which in turn will produce significant effects on the environment so as to require the preparation of an environmental impact statement. Decade asserts that a greater demand for electricity will (1) lead to increased pollution from existing generation facilities; (2) result in more rapid depletion of energy resources; and (3) in the long run, result in the construction of more environmentally destructive generating facilities. Among the aspects of rate making which Decade claims will affect demand, and hence the environment, are (1) the rate itself, the premise being that prices affect

---

[15] The record for this purpose need not follow any particular form. *See Hanly v. Kleindienst,* 471 F.2d 813, 835 (2d Cir. 1972), *cert. denied* 412 U.S. 908. However, it must reveal in a form susceptible of meaningful evaluation by a court the nature and results of the agency's investigation and the reasoning and basis of its conclusion.

demand for electricity; (2) the so-called "declining block" rate design, by which the rate charged the customer for additional units of electrical energy decreases as the customer's usage increases, thus resulting in a decreased incentive for large users to avoid energy waste; (3) preferential rates designed to favor, and thereby encourage, electric heating of residences; (4) allowing the utility to include the cost of advertising designed to foster demand for electricity in calculating its revenue requirements; and (5) setting the rate of return on common stock equity at a level which encourages the flow of capital into the business, thereby facilitating the construction of new generating capacity which would damage the environment and further the process of escalation in the consumption of electricity.

The Commission's order of August 1, 1973, in which it concluded that no impact statement was required, was very brief and did not specifically address the contentions advanced by Decade. No findings of fact were made, and insofar as appears on the record, no significant factual investigation had been undertaken by the Commission. The Commission stated that since WEPA had become effective it had followed the policy of determining the need for impact statements on a case-by-case basis, but with presumptions as to certain categories of cases, and that impact statements had not been deemed necessary in such rate increase proceedings as had been conducted theretofore. As to the March 16, 1973, rate increase order the Commission's reasons for concluding that no EIS was required were that the direct effect of the order was economic, not environmental, that whatever environmental effects there might be would be "remote and indirect," and that nothing had been submitted to the Commission to show that an EIS prepared for the rate proceeding there involved "could be based on anything other than pure speculation."

In support of the Commission's decision, the concurring opinions of Chairman Eich and Commissioner Cudahy advanced several additional considerations, which we restate as follows:

1. The relationship between price of electricity and demand—*i.e.,* the price elasticity of demand for electricity—is too poorly understood to enable prediction of the effects of rate changes upon demand, especially in view of the "infinite variety of specific rate possibilities" that assertedly would have to be taken into account.

2. Whatever EIS might be prepared would, because of the complexity of the issue, be of little or no practical value to the decision process involved in rate cases; at least the value of the EIS would not justify the time and talent that its preparation would cost.

3. An EIS would be required in connection with any power plants or transmission lines that might be required in the future, and the environmental effects of such facilities, unlike rate proceedings, are clearly identifiable.

4. The Commission already considers matters relating to the environment and to energy conservation when passing on rate increase applications.

5. Because of the complexity of the price/demand/environment relationship, the task of preparing an EIS might be so difficult and time consuming as to impair the Commission's ability to discharge its duty of establishing reasonable and just rates with reasonable expedition.

6. No evidence had been presented to the Commission to show that the rate order of March 16th would have a significant effect upon the environment.

We think the trial court was fully justified in rejecting the Commission's decision. We do not believe the record in this case presents a sufficient effort by the Commission to fulfill its statutory obligations. Rather,

it reflects an effort to support by argument and conclusion a pre-determined position that no EIS should be prepared.

Initially, we reject any intimation in the Commission's order, that because the environmental effects of a rate order are "indirect" they need not be considered under WEPA. There is nothing in the Act to suggest that only direct environmental consequences need be considered.

In *Citizens Organized to Defend the Environment v. Volpe*, 353 F. Supp. 520, 540 (S.D. Ohio 1972), the court stated regarding NEPA:

"*A federal action 'significantly affecting the quality of the human environment' is one that has an important or meaningful effect, directly or indirectly, upon any of the many facets of man's environment.* [cite omitted] The phrase must be broadly construed to give effect to the purposes of NEPA. A ripple begun in one small corner of an environment may become a wave threatening the quality of the total environment. Although the thread may appear fragile, *if the actual environmental impact is significant, it must be considered.*" (Emphasis supplied.)

Both the *Guidelines for the Implementation of WEPA*[16] and the *CEQ Guidelines* prepared for federal agencies

_____

[16] Sec. I.4.D of the Revised Guidelines for the Implementation of WEPA (note 2, *supra*) includes in the definition of "action" the "review and authorization of environmentally significant public and private actions," and states as an example of this category of action the setting of public utility rates. As to the types of effects of an action which must must be considered in assessing its environmental significance, Sec. I.5. provides in part:

"B. Stimulation of secondary effects. Even if the action itself has minimal or no direct environmental effects, if its nature is to stimulate or induce significant, secondary effects—such as major new developments encouraged by new highways or sewer extensions—the need for an impact statement is increased.

under NEPA[17] indicate that both direct and indirect effects must be considered. WEPA was intended to require

Secondary effects may often be even more substantial than the primary effects of the original action. . . .

". . .

"E. Cumulative impacts. Many state agencies' actions regarding a project or complex of projects can be individually limited but cumulatively considerable. When an action forms a precedent for future individual actions or represents a decision in principle about a future major course of action, the cumulative effects of future actions should be considered when determining if an impact statement is required."

[17] CEQ Guidelines, note 2, *supra,* 40 CFR sec. 1500.6, provides in part:

"§1500.6 Identifying major actions significantly affecting the environment.

"(a) The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. Proposed major actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases. In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action. In all such cases, an environmental statement should be prepared if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal action. The Council, on the basis of a written assessment of the impacts involved, is available to assist agencies in determining whether specific actions require impact statements.

cognizance of environmental consequences "to the fullest extent possible." Any construction limiting the Act to direct environmental effects would be contrary to its manifest intent.

We also reject any suggestion that it was incumbent upon Decade or some other party to prove to the Commission's satisfaction that significant environmental effects would be produced or that a meaningful EIS could be prepared. As we have already discussed, the burden of compliance with WEPA was upon the Commission. If in fact it was impossible to prepare an EIS "based on anything other than pure speculation" or if in fact no significant environmental effects would be involved, it was incumbent upon the Commission to show that it had undertaken a sufficient good faith factual investigation to permit such a conclusion to be reasonably made. Conclusory statements such as the order herein contains are insufficient to discharge the Commission's obligations under the statute to make the factual investigation.

We are unimpressed with the Commission's claim that an analysis of the environmental effects of rate making

"(b) Section 101(b) of the Act indicates the broad range of aspects of the environment to be surveyed in any assessment of significant effect. The Act also indicates that adverse significant effects include those that degrade the quality of the environment, curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals. Significant effects can also include actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. Significant effects also include secondary effects, as described more fully, for example, in §1500.8(a)(iii)(B). The significance of a proposed action may also vary with the setting, with the result that an action that would have little impact in an urban area may be significant in a rural setting or vice versa. While a precise definition of environmental "significance," valid in all contexts, is not possible, effects to be considered in assessing significance include, but are not limited to, those outlined in Appendix II of these guidelines."

would be so speculative in nature as to render meaningless any EIS which might be produced. The Commission relies on *First National Bank of Homestead v. Watson,* 363 F. Supp. 466 (D.D.C. 1973). The issue in that case was whether under NEPA the comptroller of currency had to prepare an EIS in connection with the chartering of a national bank in Southern Dade County, Florida. In affirming the comptroller's negative decision, the district court recognized that there are limits on the extent of environmental investigation that an agency must undertake and that it need not engage in purely speculative inquiries concerning remote theoretical possibilities.[18] However, *Homestead Bank* does not lend support to the idea that an agency may reach a negative EIS determination without investigation of relevant areas of concern. The comptroller had prepared a five-page factual memorandum, summarizing the administrative record, which included an analysis of the proposed new bank as it related to the size of the community, the bank's proposed physical location and traffic generating potential, the patterns of growth in the area, the number of existing banks in Homestead and their rate of expansion, housing and land availability, and the economic effects of the proposed bank's operations. *Id.* at 470. The district court's approval of the comptroller's decision was predicated on its finding that the memorandum "show[ed] that the

[18] The court said, 363 F. Supp. at 472, 473:

"Certainly, the burden is on the agency to prove there will be no environmental impact as a result of its actions under 102 (2)(C). . . . But the facts of this case indicate only that the federal action will *possibly* allow others to set into motion projects which *possibly* will affect the local environment. In considering the effect of its actions for purposes of sec. 102(2)(C), it would seem that an agency is not required to let its imagination run wild as to whether there will be *any* environmental impact. 'NEPA requires predictions, but not prophecy' in order to draft a meaningful impact statement under 102(2)(C). Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S. App. D.C. 395, 405, 481 F.2d 1079, 1089."

Comptroller has considered all relevant environmental factors and has reached a fair and informed preliminary decision under NEPA," *Id.* at 474, and that in the situation before it, "the actual impact [upon the environment] appears to be minimal and adequately accounted for in the (government) memorandum." *Id.* at 473.

In stating that an agency need not indulge in improbable speculation regarding environmental effects, the court in *Homestead Bank* relied upon *Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm.*, 481 F.2d 1079 (D.C. Cir. 1973). *Scientists' Institute* held that the AEC was required to prepare an environmental statement on its program to develop the Liquid Metal Fast Breeder Reactor (LMFBR) as a commercially feasible method of producing energy. The AEC had argued that it was required to prepare an EIS only for the actual construction of facilities, not on the overall program, and that the environmental consequences of the program were too remote and speculative to be susceptible to treatment in an EIS. These contentions were rejected:

" 'Certainly NEPA does not require the commission to forecast the development and effects of LMFBR power reactors in the year 2,000 in the same detail or with the same degree of accuracy as another agency might have to forecast the increased traffic congestion likely to be caused by a proposed highway . . . . The agency need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to a particular agency action requires some degree of forecasting. And one of the functions of a NEPA statement *is to indicate the extent to which environmental effects are essentially unknown*. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of a proposed action before the action is taken and the effects become fully known. *Reasonable forecasting*

*and speculation is thus implicit in NEPA,* and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling all discussion of future environmental effects as "crystal ball inquiry" ' (emphasis added)." 481 F.2d at 1092.

We think the Commission's claim with respect to the asserted speculative nature of rate making's environmental effects cannot be sustained. The *Homestead Bank Case* stands for the proposition, with which we agree, that an informed reasonable judgment that no EIS is required will not be upset by the fact that additional alleged environmental effects of an apparently minimal, improbable and speculative nature were not considered by the agency. The need for a reviewable record disclosing an adequate factual investigation of environmental effects remains. So too does the need for reasonable forecasting and speculation, which is as much implicit in WEPA as it is in its federal counterpart. The Commission's order is but a "bald conclusion, unaided by preliminary investigation," *Maryland National Capital Park & Planning Comm., supra,* and the Commission did not, on the record, undertake minimal attempts to predict the environmental effects of its rate-making function.

The Commission's preoccupation with the lack of expert consensus regarding price elasticity of demand reflects an unnecessarily cramped construction of the Act. The Commission, and WEPCO, as well, appear to assume that a single rate proceeding can and should be viewed in isolation and that limitations on the degree to which price elasticity of demand is understood together with the large number of possible combinations of individual rates that might make up a given rate schedule make meaningful environmental study impossible. However, there was no attempt to show—and we are unwilling to assume—that

usable estimates of elasticity were in fact impossible under the circumstances existing here. WEPA cannot be construed to require evaluation only of those environmental effects which can be described with computer-like precision.

Commissioner Cudahy's concurring opinion is instructive. He is willing to assume "a significant degree of elasticity of demand for electrical energy under given conditions and over given periods of time," and he further concedes that this result involves a direct impact upon the electric power economy, which in turn interacts with the environment. Yet he concludes that WEPA was not intended to apply to such a case, mainly by falling back on an assumed need for a degree of precision of understanding that he asserts is not available.

Moreover the Commission appears to take a similarly constricted view of its own regulatory activities as they may relate to the environment. In respect to electric utilities the Commission exercises a continuing, broad regulatory jurisdiction in which a given rate case is but a single episode. The Commission's actions in rate cases consist in large measure of applying existing commission policies and general principles of rate making to the specific situation presented in the proceeding before it[19] and the possibility of a cumulative environmental impact resulting from such underlying precepts, repetitively applied, was a matter the Commission could not properly have ignored.[20] The precepts upon which the Commission acts are not themselves static, but are largely a matter entrusted to the Commission's discretion. They

[19] *See* J. Bonbright, *Principles of Public Utility Rates* (1961).
[20] In respect to the need to consider the cumulative effect of a series of related actions, *see* the WEPA and CEQ Guidelines, note 17, *supra; Kleppe v. Sierra Club,* 427 U.S. 390, 413, 96 S. Ct. 2718, 49 L. Ed.2d 576 (1976) ("Cumulative environmental impacts are, indeed, what require a comprehensive impact statement.").

are subject to reexamination and alteration in the exercise of that discretion.[21] We think it clear that WEPA mandates consideration of possible environmental consequences of the various alternatives open to the Commission in this regard, and that the Commission could not properly have ignored such matters in determining whether an EIS should be prepared.[22]

The Commission also advanced as a reason for not filing an EIS in respect to rate making the fact that it prepares such statements in connection with licensing of power plants and transmission lines, the theory apparently being that this is the appropriate and adequate time to consider environmental values. This will not avail. The considerations dealt with in licensing such facilities relate primarily to locating and designing them to minimize the environmental damage. The environmental concerns raised by Decade in respect to rate making relate to the underlying demand for electricity, a matter beyond reach of the later decision on where and how to build the plants needed to satisfy that demand. Nor could the fact that the PSC allegedly already considered environmental matters in the rate-making process

[21] The Commission's authority is of course limited to that prescribed in the statutes. Under ch. 196, Stats., its duty is to fix just and reasonable rates. However, as to the regulatory techniques for the discharge of this obligation, the statutes are silent.

[22] WEPCO has argued that a so-called "make whole" rate case, such as the proceeding here involved, is inappropriate for a full consideration of the environmental aspects of rate making. As we understand it, the distinguishing characteristic of a "make whole" proceeding is that the utility does not request a change in the authorized rate of return on common stock equity. Otherwise, a make-whole proceeding potentially involves the full spectrum of issues that may be raised in a rate case. In any event the Commission's order did not purport to rest the decision that no EIS need be prepared on the basis that this was a make-whole rate case.

defeat the applicability of WEPA; if it could, the EIS requirements of the Act could be avoided by any agency with ease, rendering them wholly ineffectual.

In our discussion of the standard of review, we indicated that where a bona fide challenge to a decision not to prepare an EIS is raised, it must appear that the agency has made an investigation of a factual nature sufficient to provide a basis for the exercise of reasoned judgment, and the inquiry must have been of sufficient scope to include relevant areas of environmental concern. On the basis of the record before us, the approach taken by the Commission in the instant case was deficient in both regards. Of necessity, its decision not to prepare an EIS was therefore unreasonable and inadequate to discharge its responsibilities under the statute. The judgment of the circuit court must be affirmed.

## IV.

We, like the trial court, have conducted our review in this case on the basis of conditions as they were when the Commission's August 1, 1973 order was issued. However, several significant developments have occurred in the meantime. First, the Commission, in compliance with WEPA guidelines issued subsequent to its order herein,[23] has promulgated regulations establishing screening procedures and categorizing its repetitive activities for purposes of determining the need for environmental impact statements. Sec. PSC 2.90, Wis. Adm. Code, provides in part:

"(2) The following types of commission actions shall be individually screened using a screening worksheet to determine whether an environmental impact statement is required:
". . .

---

[23] Note 2, *supra.*

"(e) Electric rate orders in which the utility involved sells more than 5 percent of the total electric sales in the state by all public utilities.

"...

"(3) The following types of commission actions shall not require an environmental impact statement:

"...

"(g) Other electric rate orders not specified in (2) (e) of PSC 2.90."

Sec. PSC 2.91 prescribes the information to be contained on a screening worksheet.[24]

---

[24] PSC 2.91 provides:

"Environmental screening procedure. (1) A screening worksheet shall be completed by the commission staff for each individual action for the types of actions identified in PSC 2.90(2).

"(2) The screening worksheet shall contain the following information:

"(a) An adequate description of the proposed action, including maps and graphs if appropriate.

"(b) A listing, brief description and analysis of alternatives.

"(c) A listing of other agencies or groups that may have been contacted and the comments and other pertinent information of the agencies and groups.

"(d) An evaluation section which consists of questions, specific to the proposed type of action, that must be considered in evaluating the proposed action.

"(e) A finding whether or not an environmental impact statement is required. This shall be based on the findings in the evaluation section.

"(f) Identification of the individual evaluating the impact of the proposed action.

"(e) [sic] Before completion of a screening worksheet, notice of the proposed action and screening procedure shall be sent to known interested persons. Upon completion of a screening worksheet, it shall be made available for public inspection and copies shall be sent to individuals requesting such notification.

"(4) If a finding is made in the worksheet that no environmental impact statement is required, the environmental review is complete. If an environmental impact statement is required, the commission staff shall prepare a preliminary environmental report and final environmental impact statement."

WEPCO accounts for more than 5 percent of the total electric sales in the state. Thus, had PSC 2.90 been in effect when the Commission acted in this case, a screening evaluation would have been prepared, and an EIS decision made on the basis of that evaluation. This, of course, is exactly what the trial court and this court have required, assuming the screening is executed in a manner consistent with the standards set forth in this opinion.

Second, the Commission has commenced preparation of a "generic" environmental impact statement dealing, as we understand, with recurring problems and overall effects of its electric utility rate-making function.

Neither the validity of the new regulations promulgated by the Commission nor the sufficiency of its generic impact study are now before this court. However, in view of these recent developments, we deem some comment appropriate with respect to the manner of discharge of the Commission's statutory responsibilities.

One of the grounds upon which the Commission sought to justify its original refusal to prepare an EIS was the time consuming and complex nature of the task. The Commission suggested that a conflict might arise with its statutory duty to fix reasonable and just rates with reasonable expedition. In view of the Commission's complete failure to support this conclusory assertion or to otherwise conduct a satisfactory preliminary study, the asserted conflict fails to justify the Commission's decision. Moreover, compliance with WEPA to the fullest possible extent is not excused merely by considerations of administrative difficulty, expense or delay. *See Calvert Cliffs, supra,* 449 F.2d, at 1115; *Flint Ridge Development Co. v. Scenic Rivers Asso. of Oklahoma,* 426 U.S. 776, 96 S. Ct. 2430, 49 L.Ed.2d 205 (1976); Blum, et al., *Negative NEPA: The Decision Not to File,* 6 Environmental Law 309, 310–322 (1975).

At the same time, we are not insensitive to the possibility that the environmental issues may in fact be complex and that a comprehensive consideration of these issues might consume considerable time. We have indicated that the obligations imposed by sec. 1.11, Stats., are not inherently discretionary or flexible. However, we think an agency possesses a reasonable amount of discretion as to the precise mode by which compliance is effected. We think such discretion includes the Commission's developing a generic or "programmatic" EIS for rate proceedings. Indeed, the case-by-case or project-by-project approach to the threshold question of whether an EIS is required may in certain areas be too limited.

In *Scientists' Institute for Public Information v. AEC, supra,* the court held that the AEC had to prepare an EIS on its Liquid Metal Fast Breeder Reactor program as a whole. The court said (quoting from a memorandum issued to federal agencies by the Council on Environmental Quality) :

" 'Individual actions that are related either geographically or as logical parts in a chain of contemplated actions may be more appropriately evaluated in a single, program statement. Such a statement also appears appropriate in connection with . . . the development of a new progrom that contemplates a number of subsequent actions. . . . [T]he program statement has a number of advantages. It provides an occasion for a more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basic policy questions. . . .' " 481 F.2d at 1087, 1088.

In *Scientists' Institute* the AEC prepared environmental impact statements for major individual projects, as well as for the overall program. However, "policy" or program EIS's have been upheld as sufficient without

individual statements on parts of the project. *See,* for example, *National Resources Defense Council v. TVA,* 367 F. Supp. 128 (E.D. Tenn. 1973), finding one "policy" EIS for the TVA's term coal contract program adequate. In *National Resources Defense Council v. Morton,* 388 F. Supp. 829 (D.D.C. 1974), a single overall "programmatic" EIS was found inadequate for the Bureau of Land Management's livestock grazing program due to its failure to take into account local geographic conditions. Localized area EIS's were held to be required, but an EIS was not required for each separate grazing license. *See also National Resources Defense Council v. N.R.C.,* 539 F.2d 824 (2d Cir. 1976).

In light of the need for an examination of the cumulative effects of rate making and the desirability of avoiding unproductive repetitious examination of matters of rate-making policy, the Commission's decision to proceed with a program or generic EIS on electric utility rates appears reasonable. We assume the Commission is proceeding diligently to complete this undertaking. A court reviewing a rate order of the Commission may take cognizance of a failure in this regard. Once the overall study is completed, individual rate cases may be screened as prescribed in the WEPA guidelines to determine whether there may be significant environmental effects not adequately considered in the generic EIS, thus requiring that the generic EIS be updated or that a separate EIS for a particular rate proceeding be prepared.

Two additional questions arise in regard to the form in which the circuit court's judgment was cast. The judgment provided in part:

"NOW, THEREFORE IT IS ORDERED, ADJUDGED AND DECREED that the cause be remanded to the respondent Public Service Commission of Wisconsin for further proceedings consistent with the mandate of the

Court's Decision of June 16, 1975, including an investigation and evidentiary hearing as to whether or not an environmental impact study was required when the subject rate increase was granted."

The Commission and WEPCO have expressed concern with the requirement of an "evidentiary hearing," pointing out correctly that as to the threshold decision whether to prepare an EIS, no particular form of proceeding or method of gathering information is specified by the statute. The Commission was required by the circuit court to conduct an investigation of the environmental consequences of the proposed action in order to make the threshold decision whether an EIS is needed; we have indicated the investigation must be factual in nature. However, neither the nature of the information an agency may consider nor the manner in which it may be gathered are limited to the confines of a formal administrative evidentiary hearing. Nor do we think an evidentiary hearing is required as to the threshold EIS decision.

In *Hanly v. Kliendienst, supra,* 471 F.2d at 836, it was said:

". . . The necessity for a hearing will depend greatly upon the circumstances surrounding the particular proposed action and upon the likelihood that a hearing will be more effective than other methods in developing relevant information and an understanding of the proposed action. The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data."

We agree. An agency may not insulate itself from public participation, even at the threshold stage. The Commission's recently promulgated regulations (sec. PSC 2.91

(2) (e), note 24, *supra*) recognize the importance of public participation. However, we are of the opinion that the precise manner in which proceedings are conducted and a reviewable record assembled is a matter for the sound discretion of the agency involved.

Finally, we meet a problem presented merely by the passage of time. The circuit court's judgment remanded the matter for further proceedings as to whether an EIS was required in connection with the Commission's rate order of March 16, 1973. That order is now more than four years old, and several subsequent rate increases have been granted to WEPCO in the interim.

The question whether an EIS should have been prepared for the 1973 order is now of purely academic interest. WEPA is designed to ensure that environmental factors will be properly considered by state agencies within their decision processes and to advise other agencies and the public of the environmental impact of the proposed agency action. There is no way in which these purposes can be served in regard to the 1973 order. While the issues presented on this appeal clearly are not moot,[25] any further efforts by the Commission to evaluate environmental effects specific to the March 16, 1973 order would be pointless.

The critical matter at this juncture is not what the Commission should have done in 1973, but what it is doing now to comply with WEPA in respect to its ratemaking functions. The circuit court recognized this in its

---

[25] None of the parties have contended that this case should be decided on the ground of mootness, and in any event, the case is clearly one presenting issues whose consideration "ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review . . . ." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S. Ct. 279, 55 L.Ed. 310 (1911), quoted by this court in *WERB v. Allis-Chalmers Workers' Union*, 252 Wis. 436, 441, 31 N.W.2d 772, 32 N.W.2d 190 (1948).

decision (although it cast its judgment in terms of the particular rate order there involved) :

". . . [T]he object of deciding this case now, although it is truly water over the dam, is to get PSC started on a process which, we are convinced, the statute requires —namely, the careful consideration of utility rates as they affect the environment. The water keeps flowing, the rates keep rising, and the environmental effects— whatever they are—keep accumulating. These processes will not cease and PSC's efforts will not be wasted . . . ."

While we are confident that the circuit court did not intend by its judgment to require that the Commission concern itself over matters significant only to the 1973 rate proceeding, we think that to avoid uncertainty the judgment should be modified to make this clear, as well as to clarify that a formal evidentiary hearing is not required. The judgment accordingly is modified by deleting from the portion of the judgment quoted above the phrase "including an investigation and evidentiary hearing as to whether or not an environmental impact statement was required when the subject rate increase was granted."

*By the Court.*—Judgment modified as provided in this opinion and, as modified, the judgment is affirmed.

CONNOR T. HANSEN, J., concurs in the result.