AETNA LIFE INSURANCE COMPANY, Allstate Life Insurance Company, Business Men's Assurance Company of America, Connecticut General Life Insurance Company, Hartford Life Insurance Company, IDA Life Insurance Company, Montgomery Ward Life Insurance Company, Occidental Life Insurance Company of California, Philadelphia Life Insurance Company, Provident Life and Accident Insurance Company, Rockford Life Insurance Company, The Paul Revere Life Insurance Company, The Travelers Insurance Company, Washington National Insurance Company, John U. Andersen, Stuart B. Crawford, William R. Lund, Joseph Mannix, Patrick J. O'Donahue, James J. Rath, Keith Tripp, The National Association of Life Underwriters and Wisconsin Association of Life Underwriters, Plaintiffs-Respondents,

v.

Susan M. MITCHELL, Commissioner of Insurance and Office of Commissioner of Insurance, Defendants-Appellants.†

Supreme Court

*No. 80–518. Argued January 7, 1981.—Decided March 31, 1981.*
(Also reported in 303 N.W.2d 639.)

† Motion for reconsideration denied, without costs, on May 4, 1981.

For the appellants the cause was argued by *James D. Jeffries,* assistant attorney general, with whom on the briefs were *Bronson C. La Follette,* attorney general, *Robert D. Repasky* and *David J. Gilles,* assistant attorneys general.

For the respondents there was a brief by *Jon P. Axelrod, Eric A. Farnsworth* and *DeWitt, Sundby, Huggett & Schumacher, S.C.*, of Madison, and oral argument by *Jon P. Axelrod.*

Amicus Curiae brief of Center for Public Representation, National Consumers League, and Wisconsin Consumers League was filed by *Gerald J. Thain*, Center for Public Representation, *David Swankin*, National Consumers League, and *James L. Brown*, Wisconsin Consumers League, all of Madison.

Amicus Curiae brief of American Council of Life Insurance was filed by *Daniel W. Hildebrand* and *Ross & Stevens, S.C.*, of Madison.

Amicus Curiae brief of The National Association of Insurance Commissioners was filed by *Jon S. Hanson*, executive secretary of Brookfield.

COFFEY, J. This is an appeal from a judgment of the circuit court for Dane county, the Hon. W. J. Jackman, Reserve Judge, presiding. The circuit court declared Wis. Adm. Code § Ins. 2.14(3)(a) and (3)(f)[1] when joined with Wis. Adm. Code § Ins. 2.14(4)(a) (effective February 1, 1980) invalid insofar as applicable to whole life policies and enjoined Susan M. Mitchell, Commissioner of Insurance, appellant, from enforcing any penalty for a violation of the said rules. This action is before this court on certification from the court of appeals.

On May 10, 1979, this case was before this court for the first time involving these provisions of the code but with an earlier effective date of January 1, 1979. These

---

[1] Wis. Adm. Code § Ins. 2.14(3)(a) and (3)(f) creates appendixes 1 and 3 to Wis. Adm. Code § Ins. 2.14 which set forth the mandatory life insurance cost disclosure information that is the subject of this suit, namely, the "Preliminary Policy Summary, Whole Life," and "The Wisconsin Buyer's Guide to Life Insurance." *Id.* at 39 and 41 through 42–3. *See also:* pp. 6–8 *infra.*

rules, promulgated by Harold R. Wilde, the then Commissioner of Insurance, directed life insurance companies to provide prospective policy purchasers with information describing the types of life insurance (term, whole life, endowment) and their respective costs in a pamphlet entitled "The Wisconsin Buyer's Guide to Life Insurance" (Buyer's Guide),[2] together with a form labelled the "Preliminary Policy Summary" (Policy Summary).

The Buyer's Guide and the Policy Summary required to be delivered prior to sale emphasized the necessity of comparing the policies with the Surrender Cost Index (SCI)[3] as a means of comparative shopping to aid in determining the lowest cost policy. The Surrender Cost Index numbers for the policies being considered were

---

[2] Wis. Adm. Code § Ins. 2.14(4)(a), effective January 1, 1979, provided:

"(4) DISCLOSURE REQUIREMENTS. (a) The insurer shall provide, to all prospective purchasers of any policy subject to this rule, a copy of the current edition of the Wisconsin Buyer's Guide to Life Insurance and a properly filled out Preliminary Policy Summary prior to accepting the applicant's initial premium or premium deposit, except that insurers which do not market policies through an intermediary may provide the Preliminary Policy Summary and Wisconsin's Buyer's Guide to Life Insurance at the point of policy delivery, so long as they:

"Guarantee to the policyholder a 30-day right to return the policy for a full refund of premium, and

"Alert the prospective policyholder, in advertisements or direct mail solicitations, of his or her right to obtain a copy of the Wisconsin Buyer's Guide to Life Insurance and a Preliminary Policy Summary *prior to sale.*"

[3] The SCI is described in the State Life Insurance Fund Brochure as follows:

"This index [SCI] is calculated using premiums, dividends, the cash value for the duration of the index and an after-tax interest rate. These cost values are based on the assumption that the insured will live for the duration of the index [10 or 20 years] and then surrender the policy and that dividends will be paid according to the current dividend scale. The value is based on $1000 of insurance."

required to be disclosed to the consumer with the one-page Policy Summary form.

On December 15, 1978, shortly before the January 1, 1979 effective date of Commissioner Wilde's rule, Aetna Life Insurance Company (Aetna) and others,[4] the respondents, commenced an action pursuant to sec. 227.05 (1), Stats., seeking both a temporary and a permanent injunction enjoining the Commissioner from enforcing these same rules and a judgment declaring them invalid as unconstitutional, beyond the Commissioner's power to establish and not in compliance with the statutory rule-making procedures.[5] In its complaint, Aetna, et al., alleged in part that the Commissioner's rules exceeded his authority, for the life insurance cost disclosure materials ordered to be given to prospective purchasers were incomplete—misleading in violation of sec. 628.34 (1), Stats., in that these materials did not contain sufficient information to enable the consumer to make an informed purchase decision and that they falsely represented that the least costly policy could be determined solely by a comparison of the SCI numbers of the policies under consideration. Aetna based this claim on the fact that the Buyer's Guide and Policy Summary ordered by Commissioner Wilde repeatedly emphasized the importance of the Surrender Cost Index as follows:

### Policy Summary

"To find a low-cost policy, look to the policy's Surrender Cost Index, not its premium.

"The *lower* the Surrender Cost Index, the *lower* the policy's cost to you."

---

[4] The parties to this appeal are Aetna and 13 other life insurance companies as well as 7 life insurance agents and 2 associations of life insurance underwriters.

[5] We neither address the constitutional nor statutory rule-making procedure challenges as we resolve this case on the basis of the allegations in support of the claim that the rules are beyond the Commissioner's power to establish.

**Buyer's Guide**

"The basic life insurance cost index is called the 'Surrender Cost Index'.

"But the most important thing to know may be summarized quite simply: LOOK FOR POLICIES WITH LOW SURRENDER COST INDEX NUMBERS. THEY COST THE LEAST.

"THE MOST IMPORTANT THING TO REMEMBER WHEN USING THE SURRENDER COST INDEX IS THAT A SMALL NUMBER IS GENERALLY A BETTER BUY THAN A COMPARABLE POLICY WITH A LARGER NUMBER." (Emphasis and capital letters in original.)

The trial court (Judge Sachtjen)[6] denied the request for a temporary injunction and Aetna, et al., appealed. At the time of the first appeal, the appellate court reversed the circuit court but directed the trial court to enjoin enforcement of the rule pending a trial on the merits. In its decision, the appellate court concluded that the "unqualified" representations that policies with low SCI numbers "cost the least" contained in the Buyer's Guide and Policy Summary were misleading for the court determined that "it is not always true that policies with low Surrender Cost Index numbers cost the least." On the original appeal, this court, having considered Wilde's petition to review the decision of the court of appeals, vacated the decision ruling that "the propositions of law addressed by the court of appeals in its opinion should not be authoritatively determined until after a hearing on the merits." However, this court did agree with the court of appeals and continued the temporary injunction, remanding the case to the circuit court directing that court to enjoin enforcement of the rule, pending a hearing on the merits.

---

[6] The case was originally assigned to Judge Sachtjen. The record does not disclose why the case was transferred to Reserve Judge Jackman after remand.

During the interim period of time between the first appeal and the subsequent remand to the circuit court, Susan M. Mitchell replaced Wilde as Commissioner of Insurance and conducted a hearing to review a possible modification of the challenged rules. Following this hearing, Mitchell directed a change in the effective date of these administrative code rules from January 1, 1979 to on or after February 1, 1980[7] and further, made minor changes in the Buyer's Guide and Policy Summary. An example of a minor change is Mitchell's restating Wilde's earlier representations concerning the cost of policies with low SCI numbers by merely qualifying the representation with the insertion of the word "likely" as follows:

"A POLICY WITH A LOW COST SURRENDER INDEX IS LIKELY TO BE A BETTER BUY." (Emphasis supplied.)

On November 20, 1979, shortly after Commissioner Mitchell ordered the language change in the Buyer's Guide and the Preliminary Policy Summary,[8] Aetna filed an amended complaint and again claimed that the amended rules were invalid for they mandate the distribution of incomplete—misleading material, contrary to sec. 628.34(1), Stats. Specifically, Aetna termed the language change by Commissioner Mitchell as merely a "change without substance" and reiterated that the amended rules continued to require the distribution of incomplete— misleading cost disclosure information.

---

[7] See: Wis. Adm. Code § Ins. 2.14(6) (Jan., 1980).

[8] As noted in n. 1, *supra* at 92, Wis. Adm. Code § Ins. 2.14(3)(a) and (f) (Jan., 1980) provide that the current "editions" of the Buyer's Guide and the Preliminary Policy Summary required to be distributed under Wis. Adm. Code § Ins. 2.14(4)(a) are set forth in appendices 1 and 3 to the rule. These appendices contain the challenged representations.

The basis for this allegation was that the amended Buyer's Guide and Policy Summary required to be distributed, pursuant to the administrative code rules did not provide purchasers of whole life policies with an accurate picture of the relative cost of a particular policy because they emphasized the SCI to the practical exclusion of other life insurance cost indices. Aetna, et al., claimed that two other life insurance cost indexes, namely, the *Net Payment Cost Index* (NPCI)[9] and the *Equivalent Level Annual Dividend* (ELAD)[10] must also be disclosed in order to provide the consumer with sufficient information to make an informed purchase decision.

The case was tried to the court and the evidence dealing with the actuarial bases of the SCI, NPCI and ELAD, as well as that relating to the nature of whole life insurance policies, is not in dispute. Aetna, in support of their claim that the Buyer's Guide and the Policy Summary are misleading unless delivery and disclosure of the NPCI is also required before sale, established that the true cost of a whole life policy is dependent upon

---

[9] The Net Payment Cost Index is also described in the State Life Insurance Fund Brochure as follows:

"The payments index [NPCI] is calculated in the same manner as the comparable Life Insurance Surrender Cost Index except that the cash surrender value and any terminal dividend are not used. This index is useful if the main concern is the benefits which are to be paid at death and if the level of cash values is of secondary importance. It helps to compare costs at some future time, such as 10 or 20 years, if the policyholder continues paying premiums on the policy and does not take the cash surrender value."

[10] The Equivalent Level Annual Dividend is defined in the Buyer's Guide prescribed by Commissioner Mitchell as ". . . an average annual dividend, taking the time value of money into account." Wis. Adm. Code § Ins. 2.14 at p. 42–2 of appendix. It is used to determine the impact of illustrated dividends or non-guaranteed values on the SCI or NPCI. *Ibid.* ELAD reveals which policy has the greater non-guaranteed dividend.

how it is terminated,[11] by death or surrender for cash value. The SCI and the NPCI are both measures of the relative costs of whole life policies with the SCI assuming a policy termination by surrender for cash value[12] while the NPCI is premised upon the assumption of policy termination by death.[13]

At trial, Aetna, with the introduction of exhibits numbered 61 and 62, established that as a consequence of the assumption of policy surrender rather than termination by death, the use of the SCI alone cannot accurately predict the comparative costs of whole life policies when terminated by death, for the assumption that the cash value of the policy will be returned to the purchaser does not occur if the policy is terminated by death. Further, these exhibits demonstrate that in the event a policy is not surrendered, the NPCI is the more accurate measure when considering all of the elements of the policy's comparative cost[14] since, contrary to the SCI, the NPCI assumes the policy will be terminated by death and the cash value will not be available to reduce the cost of the policy.

These exhibits reflected the results of studies dealing with the accuracy of the SCI in predicting the less costly of two whole life policies, assuming that each policy will be terminated by death rather than surrender ten and twenty years after issue. Each exhibit established that when termination by death is assumed, and one of two policies under consideration has a lower SCI and the other has a lower NPCI, then the policy with the lower NPCI

[11] *See:* Wis. Adm. Code § Ins. 2.14 (Jan., 1980) at p. 42–1 of Appendix.

[12] *See:* n. 3 *supra* at p. 93.

[13] *See:* Wis. Adm. Code § Ins. 2.14 (Jan., 1980) at p. 42–1 of Appendix.

[14] The elements of the cost of protection when the policy is terminated by death are premiums and dividends.

is the less costly (or the policy with the lower SCI is the more expensive) for, as noted, the NPCI is the more accurate indicator of a policy's relative cost when it is assumed that termination will occur by death. Further, these exhibits demonstrated that as a result of their different assumptions regarding termination (death or surrender) the SCI and the NPCI often disagree as to the less costly of two policies; thus, demonstrating that the policy with the lower SCI would in fact be the more expensive policy in a substantial number of cases where termination by death occurs.

Exhibit number 61 examined the relative costs of non-participating policies as to other non-participating policies in over "500 competitive pair situations".[15] This study determined that the policies with the lower SCI were not the "better buy" in over 220 competitive pair situations (44%) when termination by death was assumed to occur ten years after issue and in over 125 competitive pair situations (25%) when the calculations were based on a termination date of twenty years after purchase.

Exhibit number 62 reflects the results of a study examining over 40,000 "competitive pair situations" involving both participating and non-participating policies. This study likewise concluded that the SCI alone is not an accurate and complete indicator of the better life insurance purchase in terms of return per premium dollar, as it determined that the SCI designated the "wrong" (more expensive) policy as the less costly in over 20% (more than 8,000) of the competitive pair situations when termination by death was assumed to occur at a ten or twenty year interval after issue.

With regard to the allegation that the Buyer's Guide and Policy Summary are misleading unless the purchaser

---

[15] A "competitive pair situation" refers to a comparison of the costs of separate policies in a competitive situation.

is also informed of the ELAD, the record demonstrates that: (1) the dividend offering of participating policies is an illustration based on the company's current dividend scale only and thus the dividends are not guaranteed to continue in the future at the rate illustrated;[16] (2) ELAD tells prospective purchasers the extent to which illustrated dividends or non-guaranteed values enter into the calculation of the SCI and NPCI for participating policies; (3) since the current illustrated dividends are used in calculating the SCI, this index usually favors participating policies over non-participating policies, particularly in the absence of ELAD; and (4) participating and non-participating policies competing in the same marketplace can only be accurately compared with the disclosure of the ELAD as well as the SCI and NPCI. As noted, Aetna, et al., claims that the failure to require disclosure of the ELAD with the SCI for participating policies is misleading for, in the absence of the ELAD, the Buyer's Guide and Policy Summary will fail to inform the prospective purchaser of the extent that non-guaranteed values[17] are factored into the SCI for participating policies.

Given the foregoing facts relating to the relationship between the SCI, the NPCI and ELAD, the question confronting the circuit court was whether the Buyer's Guide and Policy Summary prescribed by Commissioner Mitchell would be misleading to prospective purchasers of whole life insurance due to their failure to include the NPCI and ELAD with the SCI for the policies under consideration. The salient features of the Buyer's Guide prescribed by Commissioner Mitchell are:[18]

---

[16] Wis. Adm. Code § Ins. 2.14 (Jan., 1980) at p. 42–1 of Appendix.

[17] The nonguaranteed values referred to here are "illustrated dividends."

[18] Wis. Adm. Code § Ins. 2.14(3)(a) (Jan., 1980) provides for the Buyer's Guide as follows:

## "WISCONSIN BUYER'S GUIDE TO LIFE INSURANCE

"Office of the Commissioner of Insurance
123 West Washington Avenue
Madison, Wisconsin 53702

"1980

"This guide has been prepared by the Wisconsin Commissioner of Insurance.

"This guide does not endorse any company or policy. It is designed to help most consumers buy life insurance. However, individuals with unusual financial situations should seek professional advice.

### "BUYING LIFE INSURANCE

"When you buy life insurance, you should look for the least expensive policy which meets your needs. This guide will help you:

"Decide how much life insurance you should buy.

"Choose the type of policy best for you.

"Compare the cost of similar policies issued by different companies.

### "FINDING A LOW COST POLICY

"After you decide which kind of life insurance fits your needs, look for a good buy. The best way to compare similar policies is to use the cost indexes. **A POLICY WITH A LOW COST SURRENDER INDEX IS LIKELY TO BE A BETTER BUY.**

"What are Cost Indexes?

"Premiums alone do not always reveal the true cost. Cost is the difference between what you pay and what you get back. Three factors affect the cost: Premiums, dividends, and cash values.

---

"(a) Wisconsin Buyer's Guide to Life Insurance. The Wisconsin Buyer's Guide to Life Insurance is a document which contains, and is limited to, the language within the current edition of the 'The Wisconsin Buyer's Guide to Life Insurance' put out by the insurance commissioner of the state of Wisconsin. This pamphlet shall be reviewed periodically for accuracy and appropriateness. Appendix 3 to this rule contains the current edition of 'The Wisconsin Buyer's Guide to Life Insurance.' "

"Premiums are the most obvious factor in a policy's cost. You should not buy a policy unless you can afford the premiums.

"If the company's investment return, loss experience and expenses are favorable, a portion of your premium is returned as a dividend. Only participating policies pay dividends. When you consider buying a participating policy, you will receive a dividend illustration based on the company's current dividend scale. These future dividends are not guaranteed.

"Computing the cost of whole life insurance is difficult. This is because a policyholder will receive one amount of money if the policy is surrendered for its cash value and another amount if he or she dies. Usually people who buy whole life insurance policies intend to keep them but in fact many people surrender the policies early. For this reason, you should consider cash values in determining the cost of a policy.

"The Surrender Cost Index

"This index takes into account all three factors discussed above, as well as interest. The surrender cost index compares costs as if you surrendered the policy in the future and took its cash value.

"Before anyone sells you a life insurance policy, he or she must give you surrender cost index figures at 10 and 20 years. To see how that policy ranks, you should compare those figures with ones for similar policies from other companies.

"...

"To get the most reliable comparisons, keep the following rules in mind:

"Cost comparisons should be made only among similar policies. For example, you should avoid using the surrender cost index to compare term and whole life insurance.

"...

"Small differences in index numbers may be offset by other policy features or differences in the quality of service.

"...

"Other Useful Indexes

*"Life Insurance Net Payment Cost Index.* This index does not take cash values into account. It is useful if your main concern is the benefits to be paid at your death. As with the surrender cost index, a policy with a lower index figure is likely to be a better buy.

*"The Equivalent Level Annual Dividend.* This index is an average annual dividend, taking the time value of money into account.

"SHOPPING HINTS

". . .

"SHOP AROUND. Policies vary substantially in cost. Before you buy a policy, check the surrender cost index.

"COMPARE POLICIES AND COMPANIES. The company with the lowest indexes for one policy will not necessarily have the lowest indexes for others." (Bold face type and emphasis in original.)

The Policy Summary established by Commissioner Mitchell[19] requires the insurer to supply the prospective purchaser with the name and address of the issuing company, the type and name of the policy, its face amount at issue, annual premium and SCI. As to the SCI, it provides:

---

[19] Wis. Adm. Code § Ins. 2.14(3) (f) provides that the Preliminary Policy Summary required to be distributed to consumers is set forth in appendix 1 to the rule:

"(f) *Preliminary Policy Summary.* For the purposes of this rule, Preliminary Policy Summary means a document provided to the buyer of a life insurance policy prior to sale which contains necessary consumer cost disclosure information, in substantially the same format for all companies, as specified by the commissioner. Appendix 1 to this rule contains a Preliminary Policy Summary form for Whole Life and Endowment Policies. . . . Insurers may, upon request, incorporate Preliminary Policy Summary forms (if they are to be filled out by intermediaries) into copies of the Wisconsin Buyer's Guide to Life Insurance which they reprint."

"SURRENDER COST INDEX*

| | "10 years | 20 years |
|---|---|---|

"To find a low cost policy, compare *cost index figures,* not just premiums. The Surrender Cost Index takes premiums, cash values, dividends (if any) and interest into consideration. A policy with a lower Surrender Cost Index is likely to be a better buy.

"Be sure you use the Surrender Cost Index to compare only similar policies. Small differences in the index are probably not significant. Large differences may mean substantial savings. See the Wisconsin Buyer's Guide to Life Insurance for examples.

". . .

"* The Surrender Cost Index assumes that the policy is surrendered for its cash value 10 or 20 years in the future. Death prior to these surrender dates may alter the cost comparisons. Figures for participating policies are based on illustrated dividends which are not guaranteed.

"The Wisconsin Commissioner of Insurance requires an agent to complete this form when he or she takes an application." (Emphasis in original.)

The record demonstrates that various actuarial experts disagreed concerning the issue of whether the above-quoted documents would mislead prospective purchasers of whole life policies as to their comparative costs. The Commissioner's experts testified that the Buyer's Guide and the Policy Summary were not misleading despite the fact that they only required the disclosure of the SCI and represented that policies with low SCI numbers are likely to be the better buy. They further stated that the inclusion of the ELAD and NPCI would only serve to confuse the consumer and therefore disclosure of only the SCI was reasonable. Three of the commissioner's experts stated that the representation "A Policy with a low surrender cost index is likely to be a better buy," was not misleading as the word "likely" was a sufficient qualifier in the sense that consumers reading this phrase

would not rely solely on the SCI in making their purchase decisions. One of them defined "likely" as meaning "not always."

Commissioner Mitchell, when testifying in support of her rule, reiterated the testimony of her experts and stated that the required disclosure of only the Surrender Cost Index for whole life insurance cost comparison purposes was reasonable for she believed that this index provided a simple and effective means of cost comparison not likely to confuse consumers. She further recited that the Buyer's Guide and the Policy Summary were not misleading as they represented that a policy with a low SCI is only *likely* to be a better buy. However, she admitted that the SCI would not always be a perfect measure of the relative cost of whole life policies, and in particular those policies retained until death. The Commissioner also testified that although the majority of the consumers who purchase whole life policies do so with the intent to hold them until death, the decision to require a disclosure of only the Surrender Cost Index was based in part on statistics showing that most whole life purchasers, despite their initial intentions, actually surrender their policies within 20 years.

In contrast to the Commissioner and her experts, a number of actuarial and life insurance cost index experts testifying for Aetna, et al., recited that the Buyer's Guide and the Policy Summary as prescribed by Commissioner Mitchell were misleading. These experts stated that the repeated emphasis on the SCI in the Buyer's Guide and Policy Summary would lead average prospective purchasers to rely solely on the SCI in arriving at their purchase decisions. Thus, they concluded that the failure to require disclosure of the NPCI and ELAD is misleading because the mere reading of the SCI alone fails to provide sufficient and accurate information as to the relative cost of policies terminated by death as well as the extent to

which the SCI is calculated on non-guaranteed costs (illustrated dividends).[20] They cited the admitted fact that at the time of purchase most whole life purchasers intend to hold their policies until death as the basis for their opinion that the NPCI must also be disclosed for the NPCI gives the more accurate measure of the relative costs of policies terminated by death.

The circuit court entered judgment declaring Wis. Adm. Code § Ins. 2.14(3)(a) and (3)(f) and the appendices thereto (Jan., 1980) invalid insofar as applicable to whole life policies. In support of this judgment, the court agreed with Aetna that the Buyer's Guide and the Policy Summary prescribed by Commissioner Mitchell were incomplete in that they failed to also require disclosure of the NPCI and the ELAD and made the following findings of fact and conclusions of law:

"FINDINGS OF FACT
"A substantial number of policies whose low cost is judged by the Cost Surrender Index are not the lowest in cost if not surrendered but continued to death.

"Comparison of cost of participating policies with non-participating policies on the basis of the Surrender Cost Index alone results in the participating policies in having substantially lower Surrender Cost Indexes than those for non-participating policies.

"The Commissioner expects that participating and non-participating policies will be cost compared on the basis of the Surrender Cost Index alone, although such policies differ in the presence or absence of dividends and the Surrender Cost Index of non-participating policies are guaranteed and that of participating policies is not.

"It is misleading to the prospective purchaser to compare participating and non-participating policies using only the Surrender Cost Index.

"The assertion in the Preliminary Policy Survey [sic] and the Buyer's Guide that a low surrender cost index

---

[20] "Illustrated dividends" are an estimation of the annual dividends that the purchaser will receive, and are not guaranteed to continue in the future at the present "illustrated" rate.

is likely to be the better buy is not accompanied by any index which can be compared to show those cases where the Low Surrender Cost Index may not be a less expensive policy if it is not surrendered. It is therefore misleading.

"...

"Since the Surrender Cost Index in the case of participating policies is made low by the use of illustrated dividends in the calculation, the failure to disclose the Equivalent Level Annual Dividend does not permit the purchaser to determine what part of the Surrender Cost Index is based on illustrated premiums [sic], the amount of which is not guaranteed and is misleading.

"The majority of policies of a similar kind can be judged as to cost by the Surrender Cost Index, but a substantial number can not, especially when the intent is to keep the policy until death. In such cases the Net Payment Cost Index is of value to such persons. It is also a valuable comparison tool to either confirm the Low Surrender Cost Index or if it does not point in the same direction, to provoke inquiry of the purchaser into the reason for the difference. The failure to include it in the Preliminary Policy Summary is misleading.

"The Surrender Cost Index and the Net Payment Cost Index of non-participating policies are guaranteed figures, since no dividends are included in the calculations. But the Surrender Cost Index and Net Payment Cost Index of participating policies are not so guaranteed. Neither the Preliminary Policy Summary or the Buyer's Guide make this clear so that a customer may be misled, even though it is stated that dividends are not guaranteed.

"Because the Preliminary Policy Summary and Buyer's Guide have the mark of the Commissioner on them the information contained has the endorsement of the State as complete and correct, although they are incomplete and misleading because of the absence of vital information needed by a substantial number of persons to make an intelligent choice."

"CONCLUSIONS OF LAW:

"1. The rule, INS. 2.14(3)(a) [sic] as amended by the amendment promugated [sic] to take effect February 1, 1980, insofar as it directs the use of the 'Pre-

liminary Policy Summary, Whole Life' and 'Wisconsin Buyer's Guide to Life Insurance' as therein set forth as 'Appendix 1' and 'Appendix 3' are invalid and void as applied to whole life policies and being in excess of the powers of the Commissioner of Insurance because the same contain misleading information, including information misleading because of incompleteness, contrary to Sec. 628.34, Wis. Stats. and compels insurance agents to disseminate such information."

Commissioner Mitchell appealed from the judgment of the circuit court and the case is before this court on certification from the court of appeals.

*Issue*

Did the trial court err in declaring that the Commissioner of Insurance exceeded her rule-making power in requiring insurance companies to disseminate misleading cost disclosure information as to whole life policies because of incompleteness, contrary to sec. 628.34(1), Stats?

At the outset, it must be noted that this case does not involve a challenge to the Commissioner's authority to promulgate a rule requiring insurance companies to disseminate life insurance cost disclosure information. Aetna admits that the Commissioner has such authority. In fact, the record demonstrates that Aetna and the insurance industry as a whole support a complete and accurate cost disclosure requirement. However, Aetna objects to the accuracy and completeness of the information required to be disclosed in the Commissioner's Buyer's Guide and Policy Summary effective February 1, 1980.

The Commissioner attacks the trial court's ruling on two bases: (1) the trial court did not apply the correct standard of review in a proceeding challenging administrative rules under sec. 227.05(4), Stats; (2) the circuit court's findings and conclusions are not supported by the record.

## I. *Standard of Review*

According to the Commissioner, the trial court's review of the rule must be limited to a determination of whether the rule is a reasonable means of effecting the purposes of the Insurance Code found in sec. 601.01(3), Stats. (1977). She bases her argument on the premise that administrative rule-making is of its nature quasi-legislative rather than adjudicatory. Thus, in the absence of claims that she has no authority to promulgate cost disclosure rules, and that the rules were not established in compliance with ch. 227, the Commissioner contends that the standard of judicial review is the same as that for legislative acts, namely, the test of reasonableness. Accordingly, the Commissioner claims that the trial court's use of sec. 628.34(1), Stats., concerning unfair and misleading marketing practices in the insurance business as the standard of review was inappropriate as it required the court to look beyond the reasonableness of the rules and into their factual underpinnings. We disagree, as the legislature in sec. 628.34(1)(a), Stats., has prohibited insurance companies and their agents and employees from making false or misleading representations with regard to insurance contracts, including the dissemination of information that is misleading because of incompleteness:

"MISREPRESENTATION. (a) *Conduct forbidden.* No person who is or should be licensed under this code, no employe or agent of any such person, no person whose primary interest is as a competitor of a person licensed under this code, and no person on behalf of any of the foregoing persons may make or cause to be made any communication relating to an insurance contract, the insurance business, any insurer or any intermediary which contains false or misleading information, *including information misleading because of incompleteness.*" (Emphasis supplied.)

Thus, the commissioner's rules in requiring whole life insurance companies and their agents to distribute the current "editions" of the Buyer's Guide and the Policy Summary are clearly unreasonable if they require such parties to violate the law. The question of whether the Buyer's Guide and the Policy Summary are misleading is a question of fact. Thus, we must look to the record to determine if the trial court's findings are supported therein.

## II. *Trial Court's Findings*

As to the rules applicable to the review of a circuit court's finding of fact, we refer to *Klein-Dickert Oshkosh, Inc. v. Frontier Mortgage Corp.*, 93 Wis.2d 660, 663, 287 N.W.2d 742 (1980), where this court stated:

"We believe it is well-established that findings of the trial court will not be upset on appeal unless they are clearly erroneous and against the great weight and clear preponderance of the evidence. The evidence supporting the findings of the trial court need not constitute the great weight or clear preponderance of the evidence and reversal is not dictated if there is evidence to support a contrary finding. If there is to be a reversal on appeal, the evidence to support such a result must itself constitute the great weight and clear preponderance of the evidence. Furthermore, when the trial judge acts as the finder of fact, he is the ultimate and final arbiter of the credibility of witnesses. When more than one inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact. *Bank of Sun Prairie v. Opstein*, 86 Wis.2d 669, 676, 273 N.W.2d 279 (1979), and cases cited therein."

The trial court found that a substantial number of whole life policies determined to be the lowest in cost under the SCI alone are not the least expensive if ter-

minated by death rather than surrender. Aetna's exhibits numbers 61 and 62 established that a substantial number of consumers who rely solely on the SCI in making their purchase decision are likely to buy a relatively more expensive policy if they continue premium payments until death. Thus, the assertion in the Buyer's Guide and the Policy Summary that a policy with a lower SCI is likely to be a better buy, in the absence of an explanation as to when this representation may not be accurate, fails to adequately inform the purchaser and is therefore misleading.

The trial court also found that participating and non-participating policies when compared on the basis of the SCI alone as set forth in the Buyer's Guide and Policy Summary will favor participating policies over non-participating policies as the Surrender Cost Index for participating policies is reduced with the inclusion of illustrated dividends in its (SCI) calculation. The court further found that Commissioner Mitchell's Buyer's Guide and Policy Summary fail to inform the purchaser the extent to which a participating policy's SCI is based on illustrated dividends. These findings are not disputed. Thus, the Commissioner's Policy Summary and Buyer's Guide repeatedly emphasize the use of the SCI for cost comparison purposes, but fail to disclose the extent to which the SCI for participating policies is reduced by dividends that the consumer is not assured of receiving. The record demonstrates that the disclosure of the extent to which the SCI for participating policies is determined by nonguaranteed dividends is precisely what the ELAD accomplishes. Therefore, a true and accurate comparison of participating and nonparticipating policies as to illustrated dividends can only be made with the disclosure of the ELAD; hence, the presentation of the SCI without a contemporaneous revelation of the ELAD is misleading.

The circuit court further found that the SCI does not accurately measure the relative cost of a whole life policy when it is ultimately terminated by death and therefore the NPCI is of particular value to consumers who, at the time of purchase, intend to keep their policies in force until death. Commissioner Mitchell admitted that most whole life insurance purchasers buy this type of insurance with the intent to keep it in force until they die. She also conceded that the SCI would not always be a perfect measure of the relative cost of whole life policies, particularly if they were terminated by death. Despite knowledge of these facts, the Commissioner, based on the distorted reasoning that she must be primarily concerned with what people actually do with their policies rather than what they intend to do, decided to order disclosure of only one index, the SCI, because most consumers surrender their policies before the twentieth year anniversary date.

This testimony of the Commissioner demonstrates why the failure to include the NPCI in her Buyer's Guide and Policy Summary renders them incomplete and misleading. She has admitted that the majority of people who purchase whole life insurance do so with the intent to hold their policies until death, yet, in spite of her admission that the SCI "would not always be a perfect measure" for policies held until death, she repeatedly encouraged in her cost disclosure materials the singular use of the SCI. The point to be considered is that it is the consumer's intent at the time of purchase and not whether the policy is surrendered or terminated by death that should determine what information must be disclosed in order to enable them to make an intelligent and informed purchase decision. Since most consumers are interested at the time of purchase in buying death protection, the NPCI dealing with the relative costs of policies terminated by death is required to be disclosed, together

with the SCI, in order to accurately and completely inform them of their policy's relative cost and thus we hold that the disclosure of only the SCI and the failure to disclose the NPCI is misleading.

In summary, given that the SCI does not accurately predict the least costly policy under all circumstances, that the ELAD discloses a material fact that the SCI alone fails to present, namely, the extent to which illustrated dividends are reflected in the SCI, and that the NPCI is the more accurate measure of the relative cost of whole life policies terminated by death and is therefore a valuable guide to purchasers who intend to hold their policies until death, the record supports and indeed compels the trial court's finding that the Buyer's Guide and the Policy Summary are misleading in failing to inform the consumer when the SCI is likely to be inaccurate and in failing to include the NPCI and the ELAD.

Commissioner Mitchell has argued throughout these proceedings that the court should defer to the judgment of the agency in determining what cost disclosure materials should be required to be disseminated to consumers prior to sale. This argument amounts to the claim that statements and materials required to be distributed by the Commissioner, even if false or misleading, can never be challenged and, if accepted, would negate the legislative intent of sec. 628.34(1)(a), Stats. We reject this assertion for the reason that the legislature made a policy determination in sec. 628.34(1)(a), Stats., stating that life insurance contract information must not be misleading due to incompleteness when disseminated. In the context of this case, sec. 628.34(1)(a), Stats., requires disclosure of the materials that are necessary to provide consumers with a complete picture as to the relative costs, namely, the SCI (cost at surrender), the NPCI (cost at death) and the ELAD (illustrated dividends). Further,

this statute requires a complete disclosure *at the time the consumer is making the purchase decision.* The Commissioner is never at liberty to substitute her judgment when the legislature has spoken in unambiguous terms with respect to full disclosure (". . . including information misleading because of incompleteness." *Ibid.*), and thus, the court need not defer to her judgment as to what information is material and therefore required by the legislature under sec. 628.34(1)(a), Stats., unless she demonstrates reasonable grounds for that judgment. In view of our determination that the record supports the trial court's findings that Commissioner Mitchell's Buyer's Guide and Policy Summary are misleading due to incompleteness, we hold that the Commissioner has not demonstrated a reasonable ground for her judgment. Thus, we further hold that any rule requiring dissemination of cost disclosure information that is misleading due to incompleteness is beyond the scope of a commissioner's rule-making power in that it mandates a violation of sec. 628.34(1)(a), Stats.

*By the Court.*—The judgment of the circuit court is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*).

This case is a declaratory judgment action commenced pursuant to sec. 227.05(1), Stats., to obtain judicial review of a rule promulgated by the Commissioner of Insurance. The majority treats this case as if it were conducting a review of a trial by the circuit court of the Commissioner on a charge of disseminating misleading information. I write because I believe the majority's approach does not conform to the statutes or case law and because I believe it produces the wrong result.

The majority states the major question which the circuit court confronted and decided as—"Whether the Buyer's Guide and Policy Summary prescribed by Com-

missioner Mitchell would be misleading to prospective purchasers of whole life insurance due to their failure to include the NPCI [Net Payment Cost Index] and ELAD [Equivalent Level Annual Dividend] with the SCI [Surrender Cost Index] for the policies under consideration." (*Supra,* p. 100) The majority concludes that the circuit court properly held the documents to be misleading, reasoning as follows: the Commissioner's rule-making power is exceeded if the Commissioner requires insurance companies or agents to disseminate information that is misleading because it is incomplete; whether the Buyer's Guide and Policy Summary are misleading is a question of fact for the circuit court to decide sitting as the trier of facts based on evidence presented to that court; this court will not reverse the circuit court's findings that the Guide and Summary are misleading unless these findings of fact are clearly erroneous and against the great weight and clear preponderance of the evidence even if there is evidence to support contrary findings that the Guide and Summary are not misleading. This summary of the steps of the majority's reasoning highlights the basic flaw of the opinion, namely that the majority has lost sight of the nature of the case.

Briefly I view the case as follows: This case is a judicial review of a rule promulgated by an administrative agency.[1] The rule was promulgated pursuant to the

---

[1] We are now in what some commentators call the "third generation" of administrative law. The external and internal controls on administrative agencies have been the subject of increasing judicial and other scholarly attention. There have been significant new approaches in the 1970's in judicial review of administrative rulemaking. The ideas I have set forth in this dissenting opinion are in part derived from numerous state and federal cases and law review commentaries. *See generally, e.g.,* Davis, *Administrative Law Treatise* chs. 6, 7, 8 (2d ed. 1978), ch. 30 (1958); Davis, *Facts in Lawmaking,* 80 Colum. L. Rev. 931 (1980); Estreicher, *Pragmatic Justice: The Contributions of Judge Harold Leventhal*

Commissioner's statutory power to adopt rules requiring insurance companies to disseminate information about the cost of life insurance policies.[2] The Commissioner

*to Administrative Law,* 80 Colum. L. Rev. 894 (1980); Gifford, *Rulemaking and Rulemaking Review: Struggling Toward a New Paradigm,* 32 Admin. L. Rev. 577 (1980); Auerbach, *Informal Rule Making: A Proposed Relationship Between Administrative Procedures and Judicial Review,* 72 Nw L. Rev. 15 (1977); Linde, *Due Process of Lawmaking,* 55 Neb. L. Rev. 197 (1976); Gardner, *Federal Courts and Agencies: An Audit of the Partnership Books,* 75 Colum. L. Rev. 800 (1975); Nathanson, *Probing the Mind of the Administrator: Hearing Variations, and Standards of Judicial Review Under the Administrative Procedure Act and Other Federal Statutes,* 75 Colum. L. Rev. 721 (1975); Stewart, *The Reformation of American Administrative Law,* 88 Harv. L. Rev. 1666 (1975); Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L. Q. 375 (1974); Boyer, *Alternatives to Administrative Trial Type Hearings for Resolving Complex Scientific, Economic, and Social Issues,* 71 Mich. L. Rev. 111 (1972); Frohnmayer, *The Oregon Administrative Procedure Act: An Essay on State Administrative Rulemaking Procedure Reform,* 58 Ore. L. Rev. 411, 456–63 (1980); Auerbach, *Administrative Rulemaking in Minnesota,* 63 Minn. L. Rev. 151 (1979); Bunn & Gallagher, *Legislative Committee Review of Administrative Rules in Wisconsin,* 1977 Wis. L. Rev. 935; Brodie & Linde, *State Court Review of Administrative Action: Prescribing the Scope of Review,* 1977 Ariz. St. L. J. 537; Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, The Rulemaking Process,* 60 Iowa L. Rev. 731 (1975); Currie, *Rulemaking Under the Illinois Pollution Law,* 42 U. Chi. L. Rev. 457 (1975); Levinson, *The Florida Administrative Procedure Act: 1974 Revision and 1975 Amendments,* 29 U. Miami L. Rev. 617 (1975); Gifford, *Declaratory Judgments Under the Model State Administrative Procedure Acts,* 13 Houston L. Rev. 825 (1976); Sewell, *Judicial Review and the Uniform Administrative Procedures Act,* 6 Memphis St. U. L. Rev. 253 (1976).

[2] Sec. 601.41(2), Stats. 1979–80, states that the Commissioner "shall have all powers specifically granted . . . or reasonably implied in order to enable the Commissioner to perform the duties [to enforce chs. 600–646]." Sec. 601.41(3), Stats. 1979–80, grants

adopted the rule after lengthy hearings in which Aetna participated. The participants at the hearings discussed the types of information which would be helpful or misleading to consumers, and the insurance company participants presented the same arguments to the Commissioner as they later presented to the circuit court and this court. After taking into consideration the concerns of industry and the consumer, the Commissioner selected the information which she believed would be most helpful to the consumer and decided how this information could best be presented to the consumer in an informative manner which would not be misleading. In formulating the rule the Commissioner necessarily had to decide the same question which according to the majority confronted the circuit court and which now confronts this court— "whether the Buyer's Guide and Policy Summary would be misleading to prospective purchasers of whole life insurance due to their failure to include the NPCI and ELAD with the SCI for the policies under consideration." (*Supra,* p. 100) By promulgating the rule the Commissioner has implicitly answered this question in the negative. This same question can be phrased in different terms as follows: Do the Guide and Summary provide adequate, helpful information and further the Commis-

to the Commissioner "rule-making authority under s. 227.014(2)," and sec. 227.014(2)(a), Stats. 1979–80, in turn provides:

"Each agency is authorized to adopt such rules interpreting the provisions of statutes enforced or administered by it as it considers to be necessary to effectuate the purpose of the statutes, but such rules are not valid if they exceed the bounds of correct interpretation."

Aetna concedes that the Commissioner has the power to adopt rules regulating disclosure of information by insurance companies on the cost of life insurance policies. Aetna's challenge is directed to the particular rules the Commissioner promulgated.

For a discussion of interpretive rules and legislative rules and the scope of judicial review thereof, *see, Minnesota-Dakota Retail Hardware Ass'n v. Sibley Co.,* 279 N.W.2d 360 (Minn. 1979).

sioner's goal of disseminating information to assist consumers in comparing the cost of life insurance policies prior to purchase? By promulgating the rule the Commissioner has implicitly answered the question in the affirmative. In formulating the rule the Commissioner has performed a quasi-legislative, quasi-law making role which the legislature has delegated to her. In this declaratory judgment action to review the rule, the court in effect reviews the Commissioner's decision that the information she requires disseminated is not misleading and fulfills its purpose.

I dissent because the majority has not restricted itself to a review of the Commissioner's rule; instead the majority has improperly substituted a court's judgment for a quasi-legislative decision of the Commissioner.

## I. CHAPTER 227 REVIEW

I consider first the judicial review statutes applicable to this case.

The parties agree that the Buyer's Guide and Policy Summary are part of a rule promulgated by the Commissioner and that the agency action in the instant case is classified as a rule under ch. 227, Stats. 1979–80. Aetna brought this declaratory judgment action in Dane county circuit court seeking judicial review of the rule pursuant to sec. 227.05, Stats. 1979–80.[3] Sec. 227.05(1) provides that, except in instances not applicable here, "the exclusive means of judicial review of the validity of a rule shall be an action for declaratory judgment as to the validity of such rule brought in the circuit court for Dane county."

Under sec. 227.05(4), Stats. 1979–80, a court shall declare a rule invalid if the rule: violates constitutional provisions; exceeds the statutory authority of the agency;

---

[3] Chapter 227 provides two review procedures, one for rules, sec. 227.05, and the other for administrative decisions, secs. 227.15, 227.16(1), 227.20, Stats.

or was adopted without compliance with rule-making procedures.

"Sec. 227.05(4) In any proceeding pursuant to this section for judicial review of a rule, the court shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rule-making procedures."

Aetna asserts that the rule exceeds the statutory authority of the Commissioner. This challenge rests on two grounds: (1) sec. 628.34(1)(a), Stats., which prohibits an insurance company from making misleading statements similarly prohibits the Commissioner from requiring an insurance company to make misleading statements; and (2) the purposes of the insurance laws[4]

---

[4] Sec. 601.01(3)(b), (c), (g) and (j), Stats. 1977, set forth the purposes of the insurance code as follows:

"(b) To ensure that policyholders, claimants and insurers are treated fairly and equitably;

"(c) To ensure that the state has an adequate and healthy insurance market, characterized by competitive conditions and the exercise of initiative;

". . .

"(g) To maintain freedom of contract and freedom of enterprise so far as consistent with the other purposes of the law;

". . .

"(j) To keep the public informed on insurance matters;"

Sec. Ins 2.14(1), Wis. Adm. Code (1980), the "purpose" subsection of the challenged rule, states:

"Ins. 2.14 Life insurance solicitation. (1) PURPOSE. The purpose of this rule is to require insurers to deliver to purchasers of life insurance information which will improve the buyer's ability to select the most appropriate plan of life insurance for his or her needs, improve the buyer's understanding of the basic features of the policy which has been purchased or which is under consideration and improve the ability of the buyer to evaluate the relative costs of similar plans of life insurance. This rule does not prohibit the use of additional material which is not in violation of this rule or any other Wisconsin statute or rule. This rule interprets and implements, including but not limited to the following Wisconsin Statutes: ss. 601.01(3)(b), (c), (g) and (j) and 628.34."

administered by the Commissioner are frustrated by the rule which requires an insurance company to make misleading statements.[5]

The first question a rule challenge raises is what is the record on which judicial review is to be based. Sec. 227.05, Stats. 1979–80 is silent on this point. There are several alternatives, each of which presents advantages and disadvantages. The nature of the record which will be needed is dependent on the issues raised on the review. And the nature of the record may affect the scope of review. Judicial review might be limited solely to a record consisting of the language of the rule and of the statutes and a description of the procedure followed in adopting the rule.[6] Or another alternative is review based solely on the record made during the administrative rule-making proceedings. Review might also be based on a record made before the circuit court, or on a record made during the rule-making proceedings supplemented as the circuit court deems appropriate,[7] or on a record made by the administrative agency on remand to the administrative agency for further fact finding.[8]

---

[5] The majority concerns itself with only the first argument and I shall so limit my opinion. The rationale and result I espouse apply similarly to this second argument.

[6] *See, e.g., Peterson v. National Resources Board,* 94 Wis.2d 587, 288 N.W.2d 845 (1980). In *Peterson* the circuit court took testimony and this court summarizes the testimony but does not rely on it.

*See* Oregon Rev. Stats., sec. 183.400 (1979), providing that judicial review of a rule shall be limited to an examination of the rule under review; the statutory provisions authorizing the rule; and copies of documents necessary to demonstrate compliance with applicable rule making procedures.

[7] *See, e.g.,* Iowa Code sec. 17A 19(7) (1977) authorizing the court to hear and consider such evidence as it deems appropriate.

[8] Sec. 227.05(2), Stats. 1963, which required that when an issue of fact affecting the validity of a rule or the applicability of a rule to a policy is raised in a declaratory judgment judicial review

The record in this case includes proceedings before both the agency and circuit court. In the instant case transcripts were made of the Commissioner's rule-making hearings, and the Commissioner received written material in connection with the hearings. Sec. 227.02, Stats. 1979–80.[9] These administrative records were presented to the circuit court. Aetna objected to the introduction

of a rule, the matter be referred to the agency. Sec. 227.05(2) was repealed by ch. 191, Laws of 1965. Sec. 227.05(2), Stats. 1963, provided:

"(2) Whenever an issue of fact is raised concerning the applicability of a rule to a party or affecting the validity or proper interpretation of a rule, the court shall, before deciding the pertinent legal question, refer the case to the agency for determination of the fact issue under the declaratory ruling procedure provided in s. 227.06. The determination of such fact issue by the agency shall be transmitted promptly thereafter to the court by the agency, together with all papers transmitted to the agency by the court upon the referral of the case to the agency and a record or certified copy of the entire record of the proceedings before said agency in respect to such determination, subject to the same requirements and provisions as are set forth in s. 227.18. The determination shall be reviewable by the court in the proceeding in which it arose as an issue and the scope of such review shall be as provided in s. 227.20."

For a discussion of sec. 227.05(2), Stats. 1963, *see Josam Mfg. Co. v. State Board of Health*, 26 Wis.2d 587, 133 N.W.2d 301 (1965), in which the court held the agency waived any procedural right it may have had to have issues of fact referred back to the agency and further held that the circuit court was authorized to take testimony and make findings of fact. I could find no explanation or discussion of the repeal of sec. 227.05(2), Stats. 1963. I note that the repeal followed the *Josam* case. *Cf.* sec. 227.19, Stats. 1979–80.

[9] Sec. 227.02, Stats. 1979–80, requires, with some exceptions, that agencies precede rule making with notice and public hearing. *See* secs. 227.021, 227.022, Stats. 1979–80. In addition, the statutes require that the agency "keep minutes or a record of the hearing in such manner as it determines to be desirable and feasible." Sec. 227.022(2), Stats. 1979–80. Helstad, *New Law on Administrative Rule Making*, 1956 Wis. L. Rev. 407, 422.

of the administrative record in the circuit court. The grounds for the objection are not clear. Apparently there was no claim made in the circuit court that the record of the proceedings before the Commissioner were an inadequate basis for judicial review. Nevertheless, in the instant case the trial court heard extensive expert opinion testimony and based its ruling on the record made in that court.

Sec. 227.05 neither authorizes the taking of testimony nor prohibits the taking of testimony in a declaratory judgment action for review of a rule. Neither party explains why evidence was presented in the circuit court. Aetna's brief justifies the taking of testimony in circuit court citing sec. 227.05(1), Stats. 1979–80, which refers to "supporting evidence,"[10] and the order of this court which remanded the matter to the circuit court for a "hearing on the merits." But this reference in sec. 227.05(1) to "supporting evidence" appears to be to "supporting evidence" for the purpose of determining whether the legal rights of the plaintiff have been impaired so as

[10] Sec. 227.05(1), Stats. 1979–80, provides:

"227.05 **Declaratory judgment proceedings.** (1) Except as provided in sub. (2), the exclusive means of judicial review of the validity of a rule shall be an action for declaratory judgment as to the validity of such rule brought in the circuit court for Dane county. The officer, board, commission or other agency whose rule is involved shall be the party defendant. The summons in such action shall be served as provided in s. 801.11(3) and by delivering a copy to such officer or to the secretary or clerk of the agency where composed of more than one person or to any member of such agency. The court shall render a declaratory judgment in such action only when it appears from the complaint and the supporting evidence that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff. A declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule in question."

to justify the declaratory judgment action. The order of this court did not elaborate on the type of hearing to be conducted by the circuit court or prescribe the nature of the record to be reviewed or to be made. The nature of the record upon which judicial review of a rule should be conducted is an important issue. Unfortunately the majority does not consider it and does not provide guidance for future declaratory judgment actions.

Whatever the record upon which review is based, a broader question, also unanswered in sec. 227.05, Stats. 1979–80, is the scope of review, that is the principles of judicial review which the court should apply to determine whether the rule exceeds the Commissioner's statutory authority.[11]

The parties disagree as to the scope of review. Aetna argues that the issue of whether the rule is misleading is a fact issue for *ab initio* determination by the circuit court or a question of law for *ab initio* determination by the courts. The Commissioner asserts that the review is of a quasi-legislative agency determination; that the court cannot substitute its judgment for that of the Commissioner; and that the scope of review is the rational basis test.

Principles of judicial review are the means of allocating the decision-making function between agencies and courts and allowing the courts and agencies to work as partners in the furtherance of the public interest. Gardner, *Federal Courts and Agencies: An Audit of the Partnership Books,* 75 Colum. L. Rev. 800 (1975). The legislature has delegated the policy-making function to the administrative agency and has empowered the court to review the agency rules to ensure that they are lawful. A court should not rubber stamp an agency rule; such

---

[11] The Revised Model State Administrative Procedure Act (1961) on which the Wisconsin statute is based is similarly silent. *See* 14 Uniform Laws Annot. 357, 400 (Master ed. 1980).

a review would be a time-consuming, expensive ritual. Judicial review should be a meaningful supervision of the work of the administrative agencies. But in exercising such supervisory powers, the court must exercise judicial restraint. The court is to review the agency rule; the court is not to decide what the rule should be.

Recently courts and commentators have suggested that in reviewing a rule the court might deal separately with the component issues of rulemaking, such as the agency rulemaking procedure, the agency's interpretations of law, the agency's factual determinations, and the agency's decisions on policy within the agency's exercise of delegated discretion. Under the "component" or "functional" approach to judicial review, the scope of judicial review depends on the issue involved. In 1975, with the enactment of sec. 227.20, Stats. 1979–80, the Wisconsin legislature has adopted this functional approach, albeit in a different context, namely judicial review of administrative decisions. *See* Judicial Council Explanatory Notes accompanying 1975 AB 163, Ch. 414, Laws of 1975. While not expressly applicable to judicial review of rules, sec. 227.20, Stats. 1979–80, does apply to a wide spectrum of administrative decisions including quasi-legislative decisions which maybe have some similarities with agency rules.[12] I find the legislative approach to the scope of

---

[12] Sec. 227.20, Stats., is applicable to administrative decisions whether reached in a contested case to which the "fair play" provisions of secs. 227.07–227.13, Stats. 1979–80, apply or whether reached after a hearing in which these provisions do not apply. *Wisconsin Environmental Decade v. Public Service Comm.*, 93 Wis.2d 650, 659a–659b, 287 N.W.2d 737 (1980); *Ashwaubenon v. P.S.C.*, 22 Wis.2d 38, 46, 125 N.W.2d 647, 126 N.W.2d 567 (1963).

The applicability of sec. 227.20, Stats., is not limited to decisions which are adjudicatory in nature. Sec. 227.20 governs review of decisions which are reached in the "exercise of the legislative function." *Westring v. James*, 71 Wis.2d 462, 475, 238 N.W.2d 695 (1976).

judicial review embodied in sec. 227.20, Stats., useful in determining the approach to be taken in judicial review of the rule before us.

Sec. 227.20, Stats. 1979–80, provides that the court's review shall be confined to the record made before the administrative agency[13] and describes the review of agency procedure, interpretations of law, and determinations of fact or policy within the agency's exercise of delegated discretion as follows:

"227.20. **Scope of review.** (1) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court and, if leave is granted to take such testimony, depositions and written interrogatories may be taken prior to the date set for hearing as provided in ch. 804 if proper cause is shown therefor.

" . . .

"(3) The court shall separately treat disputed issues of agency procedure, interpretations of law, determinations of fact or policy within the agency's exercise of delegated discretion.

[13] *See* secs. 227.18, 227.19, 227.20, Stats. 1979–80. The record reviewed, however, is not always the record of a contested case. Thus sec. 227.20, Stats. review applies even if the reviewing court is not assured of a full record. The absence of a full record and a "fair-play adjudicative" hearing, this court has said, does not permit the court to ignore the administrative agency record. *Ashwaubenon v. State Highway Comm.*, 17 Wis.2d 120, 126, 115 N.W.2d 498 (1962); *Ashwaubenon v. P.S.C.*, 22 Wis.2d 38, 47, 125 N.W.2d 647 (1963).

Although sec. 227.20 review is on the agency record, I do not wish this opinion to be interpreted as my concluding that the circuit court cannot take evidence in a sec. 227.05 review. The issue of presenting evidence before the circuit court is, as I have noted previously, a troublesome one. At a minimum before evidence is received, the circuit court, with the aid of the parties, should determine in what way the administrative record is inadequate and for what purpose evidence will be taken. See notes 6, 7 and 8 *supra* and text.

"(4) The court shall remand the case to the agency for further action if it finds that either the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure.

"(5) The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

"(6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

"(7) If the agency's action depends on facts determined without a hearing, the court shall set aside, modify or order agency action if the facts compel a particular action as a matter of law, or it may remand the case to the agency for further examination and action within the agency's responsibility.

"(8) The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitutional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

"· · ·

"(10) Upon such review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it. The right of the appellant to challenge the constitutionality of any act or of its application to the appellant shall not be foreclosed or impaired by the fact that the appellant has applied for or holds a license, permit or privilege under such act."

To a large extent sec. 227.20, Stats. 1979–80, codifies the rules of review the courts have traditionally employed.

Distinguishing among factual findings (the task of the agency subject to review), issues of law (ordinarily the task of the court), and the agency's exercise of discretion (policy choices, the prerogative of the agency subject to review) is not easy. Often the three converge. Nevertheless using the component approach to judicial review of the rule before us helps clarify the issues and ensures that the court properly performs its judicial review function.

In this case I tend to favor using the "hard look" doctrine espoused by Judge Leventhal. As I understand it, while the focus of the doctrine is on whether the agency took the requisite "hard look," the court immerses itself in the record to see if the agency's action is supported by a factual record and reasoned articulation. Estreicher, *Pragmatic Justice: The Contributions of Judge Harold Leventhal to Administrative Law,* 80 Colum. L. Rev. 894, 906 (1980). If the agency's action is so supported, it will be upheld.

## II. REVIEW OF FACTUAL UNDERPINNINGS

The majority concludes that in order to determine whether the rule exceeds the Commissioner's statutory authority the court must "look . . . into their factual underpinnings." (*Supra,* p. 109)

I agree with the majority that although rule making involves policy determination and is an act legislative in character, *Peterson v. National Resources Board,* 94 Wis.2d 587, 595, 288 N.W.2d 845 (1980), there are frequently factual components in rule-making—as there are in the adjudicative process. Misunderstanding of the facts is as dangerous in developing an administrative

rule as in determining the outcome of an adjudicatory proceeding.

Unfortunately the majority does not set forth the "factual underpinnings" which it is examining. I suggest that the basic "factual underpinnings" of the rule are that a substantial number of policies are lapsed or surrendered rather than terminated by death; that in a majority of instances whether the policy terminates by lapse, surrender or death, the SCI and the NCPI Indexes as cost comparison tools lead to the same result; that comparison of costs of insurance policies is complex;[14] that there is a need for disclosure of cost information; and that there is no single, agreed-upon technique for comparing costs of policies prior to purchase. I believe these factual predicates of the rule are undisputed and unchallenged by Aetna, the circuit court, or the majority opinion.

The majority concludes there is another factual issue underlying the rule and sets it forth as follows: "The question of whether the Buyer's Guide and the Policy Summary are misleading is a question of fact." (*Supra,* p. 110) The majority's characterization of the question as one of fact is not supported by any citation to authority or by any reasoning of the court.

Assume for the moment, as the majority does, that the question of whether the rule is misleading is one of fact. The issue which then must be decided is who decides this fact—the Commissioner or the circuit court. Considering that the legislature has empowered the Commissioner to determine what information should be disclosed to the consumer and that the legislature has authorized the

---

[14] *See, e.g.,* Belth, *Price Disclosure in Life Insurance,* 1972 Wis. L. Rev. 1054; Bernacchi, *Implementation of Full Disclosure of Policy Value in the Life Insurance Contract,* 24 Drake L. Rev. 809 (1975); Note, *Life Insurance and The Consumer: At What Price Disclosure,* 26 Drake L. Rev. 857 (1977).

court to review the Commissioner's rule as to disclosure to determine whether it is in excess of the Commissioner's statutory authority, I conclude that if the rule is predicated on the disputed factual issue whether the information is or is not misleading, the factual issue should be decided initially by the Commissioner (on the basis of the record presented to her), and her decision should then be reviewed by the circuit court—and this court—to determine if it is supported by substantial evidence on the record. The issue comes back then to what should the record be. I shall not discuss this question further. I merely note that this court has applied the substantial evidence test to records made in "legislative-type decisions," saying that the court in deciding whether there is substantial evidence to support a legislative-type decision, determines whether reasonable minds could arrive at the same conclusion as the agency. *Ashwaubenon v. State Highway Comm.*, 17 Wis.2d 126, 131, 115 N.W.2d 498 (1962), quoted with approval in *Westring v. James,* 71 Wis.2d 462, 476, 238 N.W.2d 695 (1976).[15]

Thus, if the majority is correct that the issue is one of fact, the majority errs in permitting the circuit court to determine the fact *ab initio* rather than requiring the circuit court to review the Commissioner's determination of the fact; and the majority further errs in reviewing the circuit court's determination rather than the Commissioner's determination.

---

[15] *See* note 13 *supra.* This court has " 'equated substantial evidence with that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. . . . There may be cases where two conflicting views may each be sustained by substantial evidence. In such a case, it is for the agency to determine which view of the evidence it wishes to accept. . . .' " *Reinke v. Personnel Board,* 53 Wis.2d 123, 135, 138, 139, 191 N.W.2d 833 (1971), quoted with approval in *Daly v. National Resources Board,* 60 Wis.2d 208, 220, 208 N.W.2d 839 (1973).

## III. REVIEW OF ISSUE OF LAW

I find the majority's characterization of the issue as one of fact surprising. Ordinarily the determination of whether a rule contravenes a statute involves a comparison of the language of the statute and of the rule and an interpretation of the rule and the statute. These questions are generally viewed as questions of law for purposes of judicial review. *Peterson v. National Resources Board,* 94 Wis.2d 587, 288 N.W.2d 845 (1980). Inasmuch as the issue in this case is viewed by the majority as being whether the rule is "false or misleading" under sec. 628.34, Stats. 1979–80, the issue can be also characterized as the application of a statutory (legal) concept ("false or misleading") to an undisputed fact situation (the language of the rule). This kind of issue, sometimes characterized as a mixed question of fact and law, has generally, but not invariably, been viewed by this court as a question of law for purposes of judicial review. *Nottleson v. DILHR,* 94 Wis.2d 106, 115–117, 287 N.W.2d 763 (1980).[16]

The court's analysis in *Wawszkiewicz v. Department of the Treasury,* 480 F. Supp. 739 (D. D.C. 1979), to determine whether the contents of a rule were misleading is instructive. Consumers attacked a Department of Treasury regulation allowing wine labels to carry the name "Chardonnay" without disclosing that other grape varieties may compose up to 25 percent of the volume. Con-

---

[16] Even though the determination of the application of a statutory concept to the fact situation may be labeled a question of law, the reviewing court should not disregard the agency's determination. The determination calls for a value judgment and the court must in each case decide the extent to which weight should be given to the agency's value judgment. *Nottleson v. DILHR,* 94 Wis.2d 106, 116-117, 287 N.W.2d 763 (1980). Although I review the application of the statutory (legal) concept to the fact situation *de novo,* I believe this case is an example of one in which the agency's determination, if reasonable, should be given weight.

sumers attacked the regulation, arguing that the label was misleading because it was incomplete and arguing further that the regulation should identify the precise percentage of all grape varieties. The Treasury was empowered by statute to require wines to carry labels in conformity with regulations which "prohibit deception of the consumer" and which prohibit "irrespective of falsity" matters which are "likely to mislead the consumer." The court began its analysis by saying that the issue whether the label permitted by the regulation was misleading was one of statutory construction and therefore a question of law.[17] The court, giving the words on the label the ordinary meaning which the consumer would give them, determined that the "clear implication" to the consumer of the label bearing only the word "Chardonnay" was that the wine was made from that grape variety and no other. The court therefore concluded that the label and rule were misleading and were, therefore, as a matter of law beyond the statutory authority of the Department.[18] The Treasury has no statutory authority or discretion to sanction the transmittal of false and misleading information.

Using this approach, this court need not defer to the decision of the Commissioner or of the circuit court, and I conclude that the Buyer's Guide and Policy Summary do not in and of themselves mislead the ordinary con-

---

[17] "In examining an agency's interpretation of statutory provisions, the Court confronts questions of law which it is required to decide. . . . [C]ourts are the final authorities on matters of statutory construction. . . . As part of its independent judicial review, this Court must therefore determine *de novo* whether the agency has acted consistent with statutory authority." *Wawszkiewicz v. Dept. of the Treasury*, 480 F. Supp. 739, 743 (D. D.C. 1979).

[18] For a similar approach *see Federation of Homemakers v. Butz*, 466 F.2d 462 (D.C. Cir. 1972) ("All meat" Frankfurters); *Armour & Co. v. Freeman*, 304, F.2d 404 (D.C. Cir. 1962) ("Imitation Ham"), *cert denied* 370 U.S. 920 (1962) (preliminary injunction).

sumer. Looking at the words of the Guide and Summary for their ordinary meaning and as they would ordinarily be understood by a purchaser of life insurance of average intelligence, I conclude that the clear implication of the Guide and Summary is that cost determination of life insurance is a complex process involving many factors which the cautious consumer must evaluate. For example, the Summary states that "to find a low cost policy, compare cost index figures, not just premiums." This language of the Summary is not limited to the surrender cost index. The Summary does set forth the surrender cost index for the policy because "a policy with a lower Surrender Cost Index is likely to be a better buy." This statement does not say or mean that a policy with a lower Surrender Cost Index is always a better buy. The utility of the Cost Surrender Index is stated in a qualified manner in both the Summary and in the Guide. Repeatedly the consumer is told that the cost surrender index applies only if the consumer surrenders the policy, not if the consumer dies. The consumer is told that dividends are not guaranteed. The Summary expressly states that "the Surrender Cost Index assumes that the policy is surrendered for its cash value 10 or 20 years in the future. Death prior to these surrender dates may alter the cost comparisons. Figures for participating policies are based on illustrated dividends which are not guaranteed." Aetna is right: The policy with a lower cost surrender index may not always be a better buy. But the record shows that in the vast majority of cases the policy with a lower Cost Surrender Index will be the better buy— whether the policy is surrendered or terminated by death.

This is not a case of an agency labeling an 85 percent meat frankfurter as "All Meat,"[19] or an agency labeling wine made in part of a variety of grapes as "Chardon-

[19] *Federation of Homemakers v. Butz*, 466 F.2d 462 (D.C. Cir. 1972).

nay"[20] or an agency labeling a ham with 10 percent water as "Imitation Ham."[21] There are differences between the food labels and the Guide and Summary in the nature of information presented and in the market context in which these communications are provided to the consumer.

The food labels purport to describe the product the consumer is buying. The labels are not honest, straightforward or truthful; the ordinary purchaser is not getting the goods the label describes. These food labels, read between the shelf and the cash register, are the final and only information required to be made available to the consumer. No sales person licensed by the State of Wisconsin is present and authorized to explain the label or the intricacies of the contents of the package or to provide further information.

In the instant case, the Guide and Summary do not purport to advise the consumer whether the policy presented is the cheapest policy available for that consumer. The Guide and Summary do not predict the cost of a particular policy for a particular consumer. The true cost of the policy can be determined not at the date of purchase but only "after the fact," that is at death, maturity of the policy, or at surrender of the policy. The Guide and Summary explain how consumers can go about estimating the cost of a policy. The Guide and Summary give the consumer a short course in cost disclosure and comparison shopping. This short course can be supplemented by the licensed salesperson.

Unlike the food labels, the Guide and Summary do not contain any factual misstatements and they are not rendered false and misleading by what they fail to include.

[20] *Wawszkiewicz v. Dept. of the Treasury*, 480 F. Supp. 739 (D. D.C. 1979).

[21] *Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962), *cert. denied* 370 U.S. 920 (1962).

These documents on their face are hedged with sufficient qualifications and disclaimers to save them from such an attack. No purchaser of a life insurance policy of ordinary education and intelligence reading the documents could think that the SCI supplies all the information the purchaser needs to know or that the SCI is the "final" or "only" answer to comparison shopping. I therefore conclude that the Summary and Guide are not as a matter of law misleading.

## IV. REVIEW OF AGENCY DISCRETION OR POLICY

The essence of Aetna's position, and the essence of the majority's opinion, is that the Buyer's Guide and Policy Summary are deficient because they emphasize the SCI[22] and do not contain two other indices which may be of use to a prospective life insurance policy purchaser. The circuit court reasoned that the rules were misleading because the Commissioner failed to include useful information. Aetna and the majority seek to force the Commissioner to require insurance companies to make more detailed disclosure because they conclude that additional information would make the Guide and Summary more helpful for the consumer.

Although everyone agrees on the desirability of presenting the consumer with effective, meaningful cost disclosure, it is clear from the record, the briefs, the circuit court opinion and the majority opinion that reasonable people disagree as to the best means of achieving fair, meaningful, accurate cost disclosure which the consumer can understand. The dispute in this case really goes to the issue of whether the Commissioner's exercise of her authority as to what information must be disclosed is sound and reasonable, that is whether the Commissioner

---

[22] Since 1972 the rules have required disclosure of the Surrender Cost Index to the consumer after the policy is purchased.

has abused her discretion, whether the exercise of discretion is outside the range of discretion delegated to the Commissioner by law, whether the rule substantially furthers the objectives sought, whether the rule is a rational means to an end.

The legislature has delegated to the Commissioner the power to select the means to reach the objective. Selecting the means involves assessing existing and projected facts and predicting the effectiveness of a course of action. As I said previously, this court might review each component of the Commissioner's rule making process. The court would review the Commissioner's assessment of the facts to determine if they are supported by substantial evidence. Facts and policy blend together. In some instances of rule making, the Commissioner deals less with " 'evidentiary' disputes than with normative conflicts, projectories from imperfect data, experiments and simulations, educated predictions, differing assessments of possible risks, and the like." *Amoco Oil Co. v. Environmental Protection Agency*, 501 F.2d 722, 735 (D.C. Cir. 1974). *See* 1 Davis, *Administrative Law Treatise* sec. 6.13, p. 510 (2d ed. 1979).

In this case the Commissioner's decision as to what information will be helpful to the consumer is in the nature of a prediction for which supporting data is conflicting. Whether one index is better for the consumer than two or whether three are better than one, is not readily capable of objective determination. This "fact," really unknowable, can best be characterized as an educated prediction, or more skeptically as a hunch, based on available empirical data. The Commissioner's decision rests on an essentially legislative policy judgment, rather than on a factual determination. *Cf. FCC v. Nat'l Citizens Comm'n for Broadcasting*, 436 U.S. 775, 813–14 (1978).[23]

---

[23] For a discussion of mandated disclosure, *see, e.g.,* March 1981 *Wisconsin Securities Bulletin* (The Office of Comm'r of Securities), Vol. 9, No. 3, pp. 1–6; Bowers, Book Review of Kripke,

Where the rule turns on facts which are interrelated with policy choices, risk assessment, and predictions of the future, the court's review should be directed to the reasons and explanations advanced by the Commissioner in support of the policy choices, risk assessments, and predictions, and should not dwell only on assurances of the correctness of the factual support for the rule. When fact and policy are mixed, as they often are, the court's objective is "to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Automotive Parts and Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968). *See also Wisconsin Environmental Decade v. Pub. Service Comm.*, 79 Wis.2d 409, 425, 256 N.W.2d 149 (1977) ; *Industrial Union Dept. v. Hodgson*, 499 F.2d 467, 474–475 (D.C. Cir. 1974).

In dealing with Aetna's contention that the Summary and Guide are inadequate and should include two more indices, I again turn to the court's instructive analysis in the *Wawszkiewicz* Chardonnay wine case. The second issue in that case involved the consumers' seeking to force the Treasury to require disclosures more detailed than were necessary to prevent the label from being misleading. The court compared its review of the Treasury's statutory power to prohibit "false and misleading statements" and its review of the Treasury's statutory power to require labels which "provide the consumer with adequate information as to the identity and quality of the products." The court said that unlike the statutory obligation on the Treasury to prohibit false or misleading statements, there is a separate and different statutory

*The SEC and Corporate Disclosure: Regulation in Search of a Purpose*, 1980 Wis. L. Rev. 1081; Whitford, *The Function of Disclosure in Consumer Transactions*, 1973 Wis. L. Rev. 408.

obligation on the Treasury to ensure that the disclosure is adequate. The decision of what information to include or exclude for purposes of adequacy is subject to review, said the court, but the issue is one of agency discretion and policy and the standard of review is a "highly deferential one. The reviewing court must affirm the agency if it assures itself that a rational basis exists for the agency determination, and that the agency considered all relevant factors in arriving at its choice." *Wawszkiewicz v. Department of Treasury,* 480 F. Supp. 739, 746 (D. D.C. 1979).[24]

This statement of the standard of review of agency discretion and policy making is substantially similar to the traditional statement, which this court has adopted, of the scope of review of a rule or of a quasi-legislative administrative decision. This court has said it will review quasi-legislative administrative acton to determine if it is arbitrary or capricious, willful or irrational; if it bears any reasonable relation to its objective; if it is reasonably intended and calculated to fulfill the legisla-

---

[24] ". . . The question of whether a label, otherwise not misleading, provides adequate information is not therefore a matter of statutory construction.

"The Court instead must review the evidence in support of the agency's policy judgments, but may strike the decisicns only upon finding them 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. sec. 706(2)(A). This standard of review is a highly deferential one. The reviewing court must affirm the agency if it assures itself that a rational basis exists for the agency determination, and that the agency considered all relevant factors in arriving at its choice. . . . The Court's role here is of course not simply *pro forma,* it must be satisfied that the agency has articulated reasons and identified important facts in support of its judgment. . . . But a reviewing judge need not agree that the administrator's choice is optimal or even preferable; so long as the decision is rational and has support in the record, the court may not substitute its own judgment for that of the agency. . . ." (Citations omitted.) *Wawszkiewicz v. Dept. of the Treasury,* 480 F. Supp. 739, 746 (D. D.C. 1979).

tively authorized purposes; if it shocks the sense of justice, indicates lack of fair and careful consideration, or is not the result of the "winnowing and sifting" process. *Daly v. National Resources Board,* 60 Wis.2d 208, 216, 208 N.W.2d 839 (1973) ; *Kachian v. Optometry Examining Board,* 44 Wis.2d 1, 8, 170 N.W.2d 743 (1969) ; *Josam Mfg. Co. v. State Board of Health,* 26 Wis.2d 587, 603, 605, 133 N.W.2d 301 (1965) ; *Olson v. Rothwell,* 28 Wis. 2d 233, 239, 137 N.W.2d 86 (1965) ; 2 Cooper, *State Administrative Law* 761 (1965).[25]

## V. APPLICATION OF THE TEST OF RATIONALITY

I conclude that whether the issue before the court is viewed as a review of an issue of fact or as a review of agency discretion or policy, the scope of review is substantially similar, because the essence of the standards applicable to each is the requirement of reasonableness or rationality. 1 Davis, *Administrative Law Treatise* sec. 6.6, p. 468 (2d ed. 1978).[26] This court has said that "the substantial evidence in light of the record test" in almost any case converges with the concept of reasonableness and rationality, the usual expression of the scope of judicial review of quasi-legislative acts. *Westring v. James,* 71 Wis.2d 462, 477, 238 N.W.2d 695 (1975). *See also*

[25] "In order to set aside a regulation, it must be clearly unreasonable. If reasonable minds may well be divided on the question, the administrator must be upheld. It must be shown that no reasonable administrator would have made such a regulation and that it is lacking in reason and that it is essentially arbitrary." *Kachian v. Optometry Examining Board,* 44 Wis.2d 1, 8, 170 N.W.2d 743 (1969). This issue of reasonableness and rational basis is sometimes put in constitutional terms. *See Josam Mfg., supra.*

[26] In this case I would apply the reasonableness test and defer to the agency, even if I viewed the question as one of law. *See* note 16 *supra.*

*Assoc. Industries of NYS, Inc. v. U.S. Dept. of Labor,* 487 F.2d 342, 350 (D.C. Cir. 1973).

I turn now to determine whether the rule passes the test of rationality.

The Commissioner's emphasis in her regulations on the cost surrender index is based on the factual predicate—which as we noted previously is undisputed and unchallenged—that most policies are terminated prior to death and that in most cases the SCI and the NCPI point in the same direction.

Considering these facts, the Commissioner concluded that a regulation emphasizing the Cost Surrender Index, requiring a single index in the Summary, and discussing all the indices in the Guide, has merit on the grounds of simplicity. The circuit court reviewed the rule and concluded that the Commissioner erred in several respects in the direction of "over simplification." It is good to make things simple, says the circuit court, but it is misleading to make things simpler than they are. It is a close question whether the Summary and Guide are "simple" or "simpler." Reasonable minds could reach different conclusions. The majority admits that the record demonstrates that "various actuarial experts disagreed concerning the issue of whether the . . . documents would mislead prospective purchasers of whole life policies as to their comparative costs." (*Supra,* p. 104).

The majority, however, burrows deeper in its review of the rule and concludes that the Commissioner's approach in determining what information should be furnished to the consumer is inherently flawed because the Commissioner has been guided by what actually happens to most policies rather than by what most consumers intend to do with the policy when buying it. The majority requires the Commissioner to draft the Guide and Summary to reflect the intention of the majority of pur-

chasers to hold the policy until death.[27] To the majority of this court then "the point . . . [is] that it is the consumer's intent at the time of purchase . . . that should determine what information must be disclosed in order to enable them to make an intelligent and informed purchase decision." (*Supra,* p. 112) Even if the point has merit I think it obvious that the majority's conclusion is a policy determination for the agency not for the court. If nothing more, this statement illustrates the necessity for agency review, not *de novo* judicial decision making. For the challenge is foreseeable that were the Commissioner to base her rule on the grounds the majority suggests, she would mislead the consumer by predicating the rule on a consumer fantasy rather than on the facts of life insurance.

The court is to review the Commissioner's rule to determine if the quasi-legislative task was carried out in a manner calculated to negate the dangers of irrationality and if, on the basis of the evidence presented, her rule makes sense and is defensible. Upon a review of the record I conclude that the Commissioner's rule is the result of considered and careful study after long hearings. The Commissioner's decisional process cannot be characterized as being filled with gaps, mistakes or slipshod reasoning. It is for the Commissioner, not this court, to choose which

---

[27] The court gives specific direction to the Commissioner that all three indices must be included. Even if I agreed that the rule was invalid, I disagree with this approach taken by the majority. There are other indices which the court has not considered, and it is far from clear from the record that ELAD would be helpful. The court should not dictate the decision of what indices should be used. The Commissioner should be given the opportunity to reexamine the issue which may lead to a better articulation of the position previously taken or a change of position.

For one insurance company's advertising approach to cost disclosure, *see* The Bankers Life, *How Can I Make a Reliable Cost Comparison Between Competitive Policies,* Changing Times 43, 44 (June 1980). It refers to only two indices.

experts to believe and to predict consumer needs. The court need not conclude that the administrator's policy is the best policy or even the preferable one. Where reasonable minds may differ as to which of several measures should be chosen, courts should defer to the appropriate agency. *Mourning v. Family Publications Service*, 411 U.S. 356, 371 (1973).

The Commissioner's rule is not patently unreasonable. It is not void of rational basis. It is not the result of an unconsidered, willful or irrational choice. The Commissioner has given a rational explanation for her decision; her decision is supported by expert opinion.

The area of life insurance cost disclosure is a difficult one, and across the country regulatory agencies and insurance companies are groping for answers.[28] I might have drafted the rule in the same manner as the Commissioner or I might have drafted it differently. But I am not the Commissioner of Insurance. The record is adequate to support the Commissioner's exercise of discretion.

The rules promulgated by the Commissioner are designed to operate in the future in a multitude of transactions. At this time there is no magical formula that will assure that the consumer understands the cost of the policy. The Commissioner should be free to experiment with various rational regulatory approaches and should be able to reexamine regulatory approaches, abandoning or changing those that prove defective and retaining those that function well. The rules are published in the Administrative Code, not in concrete. The rules can be changed if they do not work. The Commissioner and the industry agree that something needs to be done to improve disclosure of cost to the consumer. I would give the rules a chance in the marketplace.

---

[28] The record shows that several states have adopted disclosure rules which principally use the cost surrender index.

For the reasons set forth, I dissent.

I am authorized to state that Justice NATHAN S. HEF-FERNAN joins in this dissent.